# EXHIBIT A

J. Michael Hennigan (SBN 59491)
hennigan@mckoolsmithhennigan.com
Kirk D. Dillman (SBN 110486)
kdillman@mckoolsmithhennigan.com
Michael H. Swartz (SBN 163590)
mswartz@mckoolsmithhennigan.com
Caroline Walters (SBN (SBN 239054)
cwalters@mckoolsmithhennigan.com
McKool Smith Hennigan, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:  (213) 694-1200
Facsimile:   (213) 694-1234

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| OAKTREE PRINCIPAL FUND V, LP.; OAKTREE PRINCIPAL FUND V (PARALLEL), L.P.; OAKTREE FF INVESTMENT FUND, L.P.; DG VALUE PARTNERS, L.P.; DG VALUE PARTNERS II MASTER FUND, L.P.; SPECIAL SITUATIONS, LLC; SPECIAL SITUATIONS X, LLC; BREVAN HOWARD CREDIT CATALYSTS MASTER FUND LIMITED; BREVAN HOWARD MASTER FUND LIMITED; VISIUM CREDIT MASTER FUND, LTD.; and VISIUM BALANCED MASTER FUND, LTD., | Case No. 2:15-cv-08574-PSG-MRW [Hon. Philip S. Gutierrez, Courtroom 880] **THIRD AMENDED COMPLAINT FOR:** **VIOLATION OF THE FEDERAL SECURITIES LAWS;** **INTENTIONAL MISREPRESENTATION;** |
| Plaintiffs, | **CONCEALMENT;** |
| v. | **FRAUD BASED ON CONSPIRACY;** |
| WARBURG PINCUS LLC; WARBURG PINCUS PRIVATE EQUITY X, L.P.; FTI CONSULTING, INC.; and SEAN CARNEY, | **NEGLIGENT MISREPRESENTATION** |
| Defendants. | **REQUEST FOR JURY TRIAL** |

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

McKool Smith Hennigan, P.C.
Los Angeles, CA

Plaintiffs allege as follows:

## I.   THE PARTIES

### A.   The Plaintiffs

1.     Plaintiffs sue to recover losses they suffered on investments in Rural/Metro Corporation ("Rural/Metro") 10.125% Senior Notes due 2019 ("Senior Notes").  These losses were caused by Defendants' wrongful acts.

2.     Plaintiff Oaktree Principal Fund V, L.P. ("Oaktree Principal V") is a Delaware limited partnership with its principal place of business in Los Angeles, California.

3.     Plaintiff Oaktree Principal Fund V (Parallel), L.P. ("Oaktree Principal V P") is a Delaware limited partnership with its principal place of business in Los Angeles, California.

4.     Plaintiff Oaktree FF Investment Fund, L.P. ("Oaktree FF") is a Delaware limited partnership with its principal place of business in Los Angeles.  Oaktree Principal V, Oaktree Principal V P and Oaktree FF are collectively referred to as the "Oaktree Plaintiffs."  The Oaktree Plaintiffs purchased the Senior Notes listed on Exhibit A on the dates, in the amounts and for the prices listed.

5.     Plaintiffs DG Value Partners, L.P., a Delaware limited partnership, DG Value Partners II Master Fund, L.P., a Cayman Islands limited partnership, Special Situations, LLC, a Delaware limited liability company and Special Situations X, LLC, a Delaware limited liability company, are collectively referred to as "DG."  DG purchased the Senior Notes listed on Exhibit A on the dates, in the amounts and for the prices listed.

6.     Plaintiff DW Catalyst Master Fund, Ltd.  was previously known as Brevan Howard Credit Catalysts Master Fund Limited, and Plaintiff DW Value Master Fund, Ltd. was previously known as Brevan Howard Credit Value Master Fund Limited and was incorrectly identified as Brevan Howard Master Fund Limited in the original complaint. They are referred to respectively as "DW Catalyst" and

"DW Value" and collectively as "DW." Both DW Catalyst and DW Value are Cayman Islands incorporated companies. DW purchased the Senior Notes listed on Exhibit A on the dates, in the amounts and for the prices listed. Exhibit A lists sales, with prices and volumes, by Plaintiff for their purchases of Senior Notes underlying their claims in this action.

7.    From May 2012 through August 1, 2013, Plaintiffs reviewed Sean Carney's, Jacob Strauss's, Warburg's, Scott Bingham's, FTI's, Michael DiMino's, Jorge Perez's and Rural/Metro's misrepresentations and other statements prior to Plaintiffs' subsequent purchases, and Plaintiffs reasonably relied on Carney's, Strauss's, Warburg's, Bingham's, FTI's, DiMino's, Perez's and Rural/Metro's misrepresentations and omissions (including their failure to disclose and correct prior misrepresentations) in making their purchases.

8.    Plaintiffs purchased Senior Notes at prices that were inflated as a result of misrepresentations and omissions (including their failure to disclose and correct prior misrepresentations) by Defendants, Bingham, DiMino, Strauss, Perez and Rural/Metro that are described below.

**B.    The Defendants**

9.    The allegations set forth in this Complaint are based on information that has thus far been made available to Plaintiffs and their counsel. Defendants have not made a complete production of documents related to Rural/Metro or submitted to depositions based on a full production.

10.    Defendant Warburg Pincus LLC ("Warburg Pincus") is a New York limited liability company. Warburg Pincus is a global private equity firm that maintains only two offices in the United States, one in California and the other in New York. Warburg Pincus is registered to do business and does substantial and continuous business in California and in this District. Warburg Pincus has purposefully availed itself of the benefits of conducting business in California, including but not limited to, the operation of its office in California, the targeting of

McKool Smith Hennigan, P.C.
Los Angeles, CA

and sales to California investors of hundreds of millions of dollars of interests in Warburg Pincus funds and portfolio companies, and the investment by Warburg Pincus funds in California-based companies.

11.     Defendant Warburg Pincus Private Equity X, L.P. is a Delaware limited partnership which does substantial and continuous business in California and in this District, and has purposefully availed itself of the benefits of conducting business in California, including but not limited to, the targeting of and sales to California investors of millions of dollars of interests in Warburg Pincus Private Equity X, L.P. Warburg Pincus Private Equity X, L.P. is an affiliate of Warburg Pincus, and acted jointly with Warburg Pincus with respect to the matters alleged in this Complaint. Warburg Pincus Private Equity X, L.P. is a Warburg Pincus private equity fund that purchased Rural/Metro in 2011.  Warburg Pincus and Warburg Pincus Private Equity X, L.P. are collectively referred to in this Complaint as "Warburg."

12.     Warburg Pincus LLC manages Warburg Pincus Private Equity X, L.P. Warburg Pincus also is under common control and management with Warburg Pincus & Co., the indirect owner of the equity interest in Warburg Pincus Private Equity X, L.P. through three intermediate tiers of ownership.

13.     Defendant Sean Carney is a managing director of Warburg Pincus and was Chairman of the Board of Directors of Rural/Metro.  While Carney was the non-executive Chairman of the Board, he was not an employee or officer of Rural/Metro.

14.     At all times that Carney was Rural/Metro's Chairman, Warburg Pincus compensated Carney as a managing director of Warburg Pincus.

15.     At all times, Carney was acting as an agent of and on behalf of Warburg.

16.     Where Warburg's knowledge, statements and omissions are discussed below, that knowledge, those statements and those omissions were also Carney's.  All Warburg employees (including Strauss and Liu) that interacted with Rural/Metro or with FTI regarding Rural/Metro reported to Carney.  The Warburg employees informed Carney of all material information that they learned regarding Rural/Metro.

McKool Smith Hennigan, P.C.
Los Angeles, CA

17.     Carney transacts business in California and in this District, including the targeting of and sales to California investors of interests in Warburg Pincus funds and portfolio companies.

18.     Defendant FTI Consulting, Inc. ("FTI") is a Maryland corporation that maintains nine offices in California, the largest number of FTI offices in any one state. FTI is a financial consultant.  In particular, at the request and direction of Warburg, FTI consulted with Rural/Metro regarding its revenue recognition procedures, regarding the allocation among months and among fiscal quarters and twelve month periods of corrections to Rural/Metro's revenue recognition, and regarding Rural/Metro's calculation of EBITDA.  FTI is not an auditing firm.

19.     FTI is registered to do business and does substantial and continuous business in California and in this District.

20.     FTI has purposefully availed itself of the benefits of conducting business in California, including but not limited to, the operation of its multiple offices in California, and the provision of business consulting, analytical and valuation services for a wide variety of California businesses and investors.

21.     FTI has a long and financially beneficial relationship with Warburg and has received and continues to receive substantial billings from Warburg.

22.     The conduct by Scott Bingham that is alleged in this Complaint was carried out by Bingham in his role as an employee of FTI.  In May 2013, Warburg had historically been one of Bingham's largest sources of work.  As of February 2014, Bingham publicly listed Warburg as his third most significant client.

23.     Each of the Defendants participated in the tortious actions alleged in this Complaint, and is proximately responsible for the occurrences, harm and damages alleged.  Each of the Defendants is also a joint venturer, partner, co-conspirator, principal, agent and aider and abettor of each of the other Defendants, and at all relevant times was acting in the course and scope of said joint venture, partnership, conspiracy and agency.

McKool Smith Hennigan, P.C.
Los Angeles, CA

4

THIRD AMENDED COMPLAINT

## II.  JURISDICTION AND VENUE

24.  Plaintiffs' claims arise in part under Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

25.  This Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. §§ 1331 and 1367, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26.  In connection with the acts alleged in the Complaint, Defendants directly or indirectly used the mails and instrumentalities of interstate commerce, including the mails, interstate telephone communications and facilities of the national securities markets.

27.  Defendants also have had substantial, continuous and systematic contacts with California, including contacts with California in carrying out the unlawful acts and conduct that are the subject of this Complaint.

28.  Defendants purposefully and intentionally directed their misrepresentations and omissions at California and did so knowing that their misrepresentations and omissions would cause harm in California.  Defendants were aware that there were both existing note investors and potential new note investors in California.  Warburg, Carney and Michael DiMino, the Chief Executive Officer of Rural/Metro, directed the June 2011 private placement offering and the February 2012 offering (both of which are discussed below) in substantial part to California investors, many of whom became existing note investors by the time of Defendants' misconduct that is discussed below.  Defendants were aware that any existing note investor who wished to sell the Rural/Metro Senior Notes would be required to forward all material information to any new investor, that misrepresentations and omissions would therefore be directly or indirectly forwarded to new investors and that a large percentage of potential new investors were in California, the largest market other than New York.  Indeed, the main purpose of Defendants' presentations

McKool Smith Hennigan, P.C.
Los Angeles, CA

regarding Rural/Metro was to provide information to both existing and potential investors to allow trading in Rural/Metro's Senior Notes and its bank loan. Defendants directed their misrepresentations and omissions to all existing and potential note investors and to the investing market. The Oaktree Plaintiffs received, reviewed and relied upon the misrepresentations and omissions in California, and, in relying on the misrepresentations and omissions, felt the brunt of the impact of the misrepresentations and omissions in California. The other Plaintiffs suffered the same injuries and damages, including the purchase of Senior Notes at artificially inflated prices, as a result of Defendants' common course of conduct in making the misrepresentations and omissions to Plaintiffs.

29.     Venue is proper in this District pursuant to both Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendants transact business in this District. Additionally, acts constituting the violations alleged in this Complaint took place in this District. The misrepresentations and omissions which underlie the Plaintiffs' claims were purposely directed to California, and were received by the Oaktree Plaintiffs in California. The Oaktree Plaintiffs' decisions to purchase and their purchases of the Senior Notes were made in this District, and their losses were incurred in this District.

## II.     SUMMARY OF ACTION

30.     During all periods relevant to this complaint, Rural/Metro was one of the nation's largest providers of ambulance services, including emergency and non-emergency medical transportation services. Rural/Metro obtained its revenues primarily from reimbursements by private insurance companies and government funded healthcare programs such as Medicare and Medicaid. Rural/Metro also obtained revenues, to a lesser extent, through fees paid directly by uninsured patients. Rural/Metro's customers included municipalities, fire districts, government agencies, hospitals, nursing homes, specialty healthcare facilities and individual patients.

McKool Smith Hennigan, P.C.
Los Angeles, CA

Rural/Metro served numerous communities in over 20 states, including California, one of the primary sources of ambulance revenues for Rural/Metro.

31.     Warburg purchased Rural/Metro in June 2011 for approximately $760 million.  Warburg publicly touted its expertise in taking over and growing healthcare companies and highlighted Rural/Metro as its single largest healthcare investment in 2011.

32.     After Warburg's purchase of Rural/Metro, Warburg and Carney became aware of deeply troubling issues concerning Rural/Metro's financial accounting systems, performance and operations.

33.     Carney acted to further the interests of Warburg, particularly Warburg Pincus.  He conducted the fraudulent acts alleged in this complaint to further the financial interests of Warburg, even when truthful conduct would have been in the best interest of Rural/Metro.

34.     Given Rural/Metro's actual financial condition in 2012 and 2013, as understood by Carney, Liu and Warburg, Rural/Metro needed to restructure its obligations because it was not generating enough earnings and cash to pay its obligations on time on a reliable basis.  An orderly restructuring through bankruptcy or an out-of-court restructuring can dramatically help a troubled company like Rural/Metro.  While this is true of most companies, it was particularly the case for Rural/Metro because it had periodically-expiring contracts where certain payers (e.g., municipal customers) might not renew those contracts if Rural/Metro went into bankruptcy.  Orderly bankruptcy planning or an out-of-court restructuring could avoid the negative impact of those renewal issues through negotiations with payers or by avoiding bankruptcy with an out-of-court restructuring.

35.     But for Warburg as the equity owner of Rural/Metro, a bankruptcy or out-of-court restructuring would be a disaster.  In either scenario, the value of Warburg's equity stake would likely be extinguished entirely, or at best reduced to a tiny fraction of the amount Warburg had invested.  In the vast majority of corporate

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

bankruptcies and the substantial majority of out-of-court restructurings, equity holders receive no recovery. As Warburg itself stated in a filing in this matter, "as Rural/Metro's sole shareholder, Warburg had the most to gain by trying to avoid a bankruptcy."

36. Rather than serving the interests of Rural/Metro in his capacity as its Chairman and recommending an out-of-court restructuring or bankruptcy, Carney solely served Warburg's interest by recommending courses of action, including the presentation of false and misleading financial figures, to avoid an out-of-court restructuring or bankruptcy. By forcing Rural/Metro to avoid a timely coming to terms with its known financial situation, Carney and Warburg ensured that Rural/Metro would have to enter an emergency bankruptcy, without any of the planning that could have mitigated the contractual impacts of an emergency bankruptcy. Carney likely hoped that a miracle would happen that would allow Rural/Metro to avoid taking the actions that would devastate the value of Warburg's investment. But hoping for that miracle was not in Rural/Metro's best interest, only Warburg's.

37. Carney also sought to further Warburg's interest in perpetuating the illusion that its investment was not a disaster and that its healthcare expertise was authentic.

38. Carney's conduct in causing fraudulent financial disclosures was not consistent with the proper norms of corporate behavior. Presenting false and misleading financial figures and lying to investors about a company's financial condition is not proper corporate behavior. A board chairman making recommendations and directing actions that are not consistent with a company's best interest is also not consistent with proper norms of corporate behavior.

39. Carney routinely updated others at Warburg on Rural/Metro's operational and financial status. In response and to protect Warburg's significant investment in Rural/Metro, other people at Warburg confirmed Carney should continue with his plan

McKool Smith Hennigan, P.C.
Los Angeles, CA

to cause Rural/Metro and DiMino to continue their improper fraudulent practices, including but not limited to continuing with fraudulent financial reporting and omissions of material information. Carney acted on and implemented the direction from others at Warburg that he should continue to cause fraudulent conduct rather than confront the known, actual condition of Rural/Metro with a bankruptcy or out-of-court restructuring.

40. Carney also relied on Jacob Strauss of Warburg Pincus to help Carney to ensure that Rural/Metro's activities were controlled in a manner that served the best interests of Warburg even when that conduct did not serve the best interests of Rural/Metro. Strauss was only an employee of Warburg Pincus. He had no position with Rural/Metro.

41. By no later than early March 2012, Warburg and Carney learned from Rural/Metro's CEO DiMino and its Chief Financial Officer Jorge Perez that the ratio of cash collections to recorded revenues had been steadily decreasing. This ratio should not have been decreasing. The declining ratio indicated that the recorded revenues were incorrect and that the degree of error was increasing.

42. Warburg also became aware of the fact that Rural/Metro's base business was performing below Warburg's projected worst case downside scenario. After investigation, Warburg and Carney learned that Rural/Metro's revenue recognition systems were antiquated, defective and unable to determine the company's revenues reliably and accurately. Warburg and Carney learned that Rural/Metro's systems consistently produced inflated figures for revenues and earnings.

43. Together, these problems exposed Rural/Metro to large write-offs of its reported revenues and earnings and rendered the revenue and earnings numbers reported to Rural/Metro's investors inaccurate, overstated and unreliable.

44. The problems with Rural/Metro's revenue recognition system were exacerbated by two substantial acquisitions that it made within months of Warburg's purchase and which were integral to Warburg's aggressive growth-through-acquisition

McKool Smith Hennigan, P.C.
Los Angeles, CA

9

2:15-cv-08574-PSG-MRWx

strategy for the company. After the acquisitions, Rural/Metro discovered that the
revenues of the two acquired companies also could not be reliably reported.
Furthermore, the additional burden of integrating the two acquired companies
materially exacerbated the problems with Rural/Metro's already unreliable and
inadequate billings and collection systems.

45. In an effort to boost revenues, at the direction of Carney (on behalf of
Warburg) and DiMino, Rural/Metro periodically implemented commercial price
increases. Due to contractual and other limitations, however, Rural/Metro's ability to
pass on price increases, and receive meaningful increases in associated revenue, was
limited. Its failure to take these limitations properly into account led to additional
overstatements of the reasonably expected rate of collections and an overstatement of
revenues. Nonetheless, as part of an effort to deceive investors with financial reports
indicating successful growth in, and desirable levels of, earnings and EBITDA,
Carney and DiMino caused Rural/Metro to prepare and distribute pointless billing
statements and rate sheets reflecting price increases that Rural/Metro could not expect
to collect, with the direction that its reported revenues should be calculated based on
the inflated prices and based on an assumption that 100% of the price increase would
flow through to receivables (at the existing average collection rates) even though far
less than 25% of the price increase would be expected to flow through (at the existing
average collection rates).

46. With Warburg, Carney, DiMino's and (later) FTI's active participation
and involvement, Rural/Metro held quarterly calls to report on the company's
financial performance to current and prospective lenders and noteholders in
Rural/Metro. Rather than disclose to investors true and correct information
concerning Rural/Metro's financial condition and the antiquated, defective and
unreliable nature of its revenue recognition systems, Rural/Metro, DiMino, Perez,
Bingham and Defendants instead consistently presented a false picture of financial
health to noteholders and lenders in an effort to salvage one of Warburg's most

important healthcare investments. In doing so, Rural/Metro, DiMino, Perez, Bingham and Defendants consistently made misstatements regarding historical facts, including Rural/Metro's historical revenues and EBITDA. From at least May 2012 through July 2013, Warburg, Carney, Rural/Metro, DiMino (until his termination in May 2013), Perez (in 2012) and (in the latter part of the period) FTI and Bingham made material misrepresentations and failed to disclose material facts to investors and potential investors in the Senior Notes related to three key areas:

(a) **Rural/Metro's Antiquated And Unreliable Revenue Recognition System.** Commencing no later than the May 2012 investor call, Warburg, Carney, Rural/Metro, DiMino and Perez repeatedly made material misrepresentations concerning the financial performance of Rural/Metro by failing to disclose that Rural/Metro was unable to determine its revenues accurately and reliably and that Rural/Metro's reported results were therefore inflated (as they were later confirmed to be) and unreliable.

(b) **Accounts Receivable Write-Offs Were Not One-Time Events.** In particular, Rural/Metro's flawed revenue recognition system resulted in a $17.6 million accounts receivable write-off that was announced to investors during a September 2012 investor call. This write-off was falsely described by Rural/Metro and DiMino as a "one-time clean-up item." They knew at the time of the call that the revenue recognition system had not been fixed, and that Rural/Metro would likely need additional write-offs in future quarters— meaning that additional write-offs that should have been recorded by the time of the September 2012 call would be recorded in later time periods. Carney also attended that call and knew the true facts. But he also did not disclose the truth.

(c) **Rural/Metro's March 31, 2013 Last Twelve Months EBITDA Was At Least $6 Million Less Than Represented.** In January 2013, FTI was retained to assist in fixing Rural/Metro's revenue recognition system and in quantifying

McKool Smith Hennigan, P.C.
Los Angeles, CA

11

2:15-cv-08574-PSG-MRWx

McKool Smith Hennigan, P.C.
Los Angeles, CA

how much in additional write-offs was required. Based on FTI's work, during the May 2013 investor call an additional $35.2 million accounts receivable write-off was disclosed. FTI, Bingham, Warburg, Carney, Strauss and Rural/Metro falsely represented that Rural/Metro's Last Twelve Months adjusted EBITDA as of March 31, 2013 was $70 million, when they each knew it was $64 million or less. EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) is a proxy for cash flow that is used by investors to assess a company's historically-demonstrated ability to generate sufficient earnings to pay its obligations as they come due. EBITDA is frequently used by investors as a tool to value a company by applying an appropriate multiple to historical EBITDA. It was critical that Rural/Metro's EBITDA be at least $70 million so that the business was generating approximately enough cash to cover its annual cash requirements and could continue to operate without a major restructuring. Presenting a $64 million EBITDA figure would have revealed that Rural/Metro was going to need a near-term, major restructuring of its obligations and that it was likely not going to be able to pay its debts, including its interest obligations, as they came due. In fact, Rural/Metro's Last Twelve Months EBITDA as of March 31, 2013 was far less than $64 million.

(d) **Defendants Knew, but Never Disclosed and Corrected, the False EBITDA Figure Given to Investors.** As detailed below, by mid-June 2013, to the extent that they did not all know with certainty that Rural/Metro's EBITDA for the twelve months ending March 31, 2013 was $64 million or less, Rural/Metro, Warburg, Carney, Strauss, FTI and Bingham learned that Rural/Metro's EBITDA for that twelve month period had been $57 million or less. As a result, Rural/Metro, Warburg, Carney and FTI had a duty to disclose and correct their prior misrepresentation of historical fact to actual and potential noteholders. They did not do so. Instead, on June 27, 2013, Rural/Metro

disclosed to its bank lenders that its EBITDA through March 2013 was approximately $55 million and that recent months, including March 2013, had lower monthly EBITDA rates. Because this information was not disclosed to Plaintiffs, they were defrauded into making their subsequent purchases at inflated prices.

47. When the true nature and extent of Rural/Metro's financial distress and overstated revenues were ultimately revealed to the market, the value of Plaintiffs' Senior Notes plummeted as a result.

48. On August 4, 2013, Rural/Metro filed for reorganization under Chapter 11 of the United States Bankruptcy Code. The price of the Senior Notes remained in the 20's or very low 30's for months after the bankruptcy filing.

49. Plaintiffs seek recovery of losses incurred as a result of Defendants' wrongful acts. Defendants' wrongful misrepresentations and omissions proximately caused Plaintiffs' purchases of the Senior Notes at artificially inflated prices and proximately caused Plaintiffs to lose a large portion of their investment in Rural/Metro.

## III. WARBURG'S JUNE 2011 ACQUISITION OF RURAL/METRO

### A. Acquisition of Rural/Metro and Issuance of the Senior Notes

50. In June 2011, affiliates of Warburg Pincus, including Warburg Pincus Private Equity X, L.P., purchased all of Rural/Metro's stock, which had previously been publicly traded, for approximately $760 million. The purchase was funded in part with approximately $218 million of Warburg funds, a private placement offering of $200 million of Senior Notes, and proceeds of approximately $325 million from a Credit Agreement dated June 30, 2011.

51. Warburg was the Sponsor of the Senior Notes offering. As Sponsor, Warburg retained as its agents the investment banks who promoted the Senior Notes offering, and Warburg led the drafting of the Senior Notes Offering Memorandum, the related due diligence and the issuance of the Senior Notes to investors. The Senior

Notes were not registered under the Securities Act of 1933, as amended, or any state securities laws, and were therefore required to be offered and sold only to qualified institutional buyers in accordance with Rule 144A under the Securities Act.

52.     In the Offering Memorandum dated June 24, 2011, Warburg emphasized its health care experience and touted itself as a "growth investor and an experienced partner to management and teams seeking to build durable companies with sustainable value" and as a business that invested more than "7.5 billion in healthcare companies." Warburg touted its "Deep Expertise in Healthcare" and its history of "[c]reating value in Healthcare Companies." The success of the Rural/Metro acquisition was important to Warburg's story of its expertise in healthcare investments. Of the $500 million Warburg invested in healthcare companies in 2011, Rural/Metro was its single largest new healthcare investment.

53.     After completing the purchase of Rural/Metro, Warburg immediately assumed control of Rural/Metro and maintained such control throughout the relevant period. Warburg elected a new Board of Directors, including Warburg principals Carney and Eric Liu. Warburg chose to have DiMino continue to serve on the new Board of Directors and to act as Chief Executive Officer of Rural/Metro. Warburg had the power, and ultimately exercised the power, to terminate DiMino. Carney was appointed Chairman of the Board and was integrally involved in all major decisions and events impacting Rural/Metro. Liu was appointed to the Rural/Metro Audit Committee and was similarly integrally involved in major matters at Rural/Metro. As a result of their roles with Rural/Metro, and while acting on behalf of Warburg, Carney and Liu learned all material facts regarding Rural/Metro's financial condition.

54.     Warburg and Carney had ultimate control of the written statements and scripted oral statements by Rural/Metro and DiMino set forth in this complaint. Rural/Metro, through DiMino or others, jointly drafted Rural/Metro's written presentations and scripted oral presentations with Warburg, Carney and Strauss. Rural/Metro and DiMino would not make a statement that Warburg and Carney did

1  not approve (given their control of Rural/Metro and their control of whether DiMino
2  and Perez continued in their positions).  Warburg and Carney did approve
3  Rural/Metro and DiMino making the written and scripted oral misrepresentations
4  described in this Complaint.  This control extended to all of Rural/Metro's written
5  misrepresentations and omissions and scripted oral misrepresentations and omissions
6  alleged in this Complaint.

7  **B.    Warburg's Strategy of Growth Through Acquisition**

8      55.    Carney led the team at Warburg responsible for the purchase of
9  Rural/Metro, a team that also included Liu and Strauss.

10     56.



18     57.    Warburg exercised control over Carney as his employer.

19     58.    Warburg and Carney exercised control over Rural/Metro and its
20  management, including DiMino and Perez, through Warburg's 100% ownership of
21  Rural/Metro, through Warburg's right to manage the ownership of Rural/Metro and
22  through Carney's position as Chair of Rural/Metro's board.  While Rural/Metro had
23  non-Warburg directors, Warburg chose those directors and those directors did not seek
24  to take any control of Rural/Metro away from Warburg.  DiMino, Perez and
25  Rural/Metro took direction from Warburg with respect to all statements and omissions
26  regarding Rural/Metro's financial condition and all other statements and omissions
27  alleged in this Complaint.

28

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

## IV. RURAL/METRO'S REVENUE RECOGNITION AND BILLING SYSTEMS

### A. Rural/Metro's Revenue Recognition Methodology

59. During all periods relevant to this complaint, Rural/Metro provided emergency response services primarily under exclusive contracts with counties, municipalities, fire districts and other governmental agencies. These contracts governed Rural/Metro's right to provide emergency ambulance services and, to some extent, its compensation for those services. These contracts typically required Rural/Metro to respond to all emergency calls in a designated area. Under such agreements, Rural/Metro was required to transport a patient regardless of the individual's ability to pay.

60. Rural/Metro published a schedule of rates for the various services it offered. But the actual payment amounts it received for any transport depended significantly on applicable contractual arrangements with third party payers (such as insurance) or the amounts allowed by Medicare/Medicaid rules. Such differences (between Rural/Metro's published rates and lower amounts set by contract or regulation) are sometimes referred to as "contractual allowances."

61. Rural/Metro recognized revenues for its ambulance services when the services were provided. Rural/Metro's revenues were reported net of estimated contractual allowances for Medicare, Medicaid and other third party payer reimbursement limitations, and net of estimates for uncompensated care. Reliable and proper assessment of the applicable contractual allowances and uncompensated care allowances was essential to an accurate net revenue calculation. Underestimated contractual allowances would produce overstated net revenue.

62. Rural/Metro also needed to determine accurately its recordable revenues from charges it made to uninsured individuals. If it could not determine such revenues reliably, Rural/Metro could not record the related revenues until the collections were made. Collections from uninsured individuals are notoriously less

2:15-cv-08574-PSG-MRWx

certain than collections from third-party payers. A reliable and recordable net revenue figure required that billed amounts be adjusted downward based on an informed and realistic estimate of the existing, historically justified likelihood of actually collecting from uninsured individuals.

63. In sum, Rural/Metro's actual cash receipts and properly recognized revenue for each transport varied based on the source of payment, and depended on whether patients were uninsured, held commercial insurance or had medical expenses covered by Medicare or Medicaid. The industry refers to this composition of parties making payments as the "payer mix."

64. In reporting its net revenues (*i.e.*, revenue per transports after taking into account adjustments for contractual allowances and uncompensated care), Rural/Metro used an average patient charge ("APC") for transports in each geographical region in which Rural/Metro operated.

65. While Rural/Metro's revenue recognition process used several inputs, some of which were based on current data, a large component of Rural/Metro's net revenue figure and the assessment of the collectability of Rural/Metro's accounts receivable were based on a 13 month "look back" methodology which employed collection rates more than a year old. According to PowerPoint slides attached to an email dated May 19, 2013 from Warburg's Strauss to FTI's Bingham, Warburg's Liu and others, as corroborated by Stephen Farber's August 8, 2014 declaration, among other problems associated with using such outdated collection data, the 13 month "look back" did not take into account the changes in payer mix and payers' rates of reimbursement in recent months, thus impacting the amount of proper adjustments for contractual allowances and uncompensated care. Because Rural/Metro's reported net revenues did not reflect recent payer mix changes and other changes to variables impacting collection rates, the reported revenues were inaccurate, overstated and not properly recordable. While Rural/Metro sometimes disclosed that changes in payer mix could result in lower collections, Rural/Metro, DiMino and Perez did not reveal

17

2:15-cv-08574-PSG-MRWx

when they knew that greater reserves and lower recorded revenues were already
necessary due to changes in payer mix and did not reveal their knowledge that
Rural/Metro's supposedly highly reliable and improved financial management and
revenue recognition systems (with "added methodologies") were neither reliable nor
improved with "added methodologies."

66.     Periodically, Rural/Metro increased the levels of its published rates.
When it did so, it also increased the net revenue it recognized for transports to be paid
for by third party payers.  The accuracy of Rural/Metro's net revenue figures was
further compromised by its accounting treatment of the impact of such rate increases.
Rural/Metro's methodology assumed that it would collect a significant portion of the
rate increases when it was certain (due to contractual arrangements between
Rural/Metro and various payers), and consistent with Rural/Metro's own experience,
that such a large portion would not be collectible.  Rural/Metro's unilateral changes to
its own rate structure could not alter its established contractual entitlements.
Rural/Metro could not properly record the amount of revenues that it projected from
its rate increases.

67.     Revenue is a key item to investors in evaluating a company and its
financial statements.  As Warburg, Carney, Rural/Metro and DiMino knew, to be
properly recorded as revenues, a company's estimates of its future cash receipts must
be reasonable and result in amounts that have a high likelihood of being collected.
Warburg, Carney, Rural/Metro, DiMino and Perez also knew that their revenue
presentations were supposed to reflect the economics of the business.

68.     It is a material fact to a reasonable investor whether an entity is able to
make a reasonable and reliable determination of its revenues.

69.     EBITDA, which is a proxy for cash flow based on reported revenues, is
also a critical and material factor considered by investors in making investment
decisions.  While EBITDA is not a statement of cash flows, due to timing differences
between the recording of revenues and their receipt and due to generally small

THIRD AMENDED COMPLAINT

McKool Smith Hennigan, P.C.
Los Angeles, CA

differences between actual cash receipts and the revenue recorded on an accrual basis in accordance with the proper implementation of accounting standards requiring certainty of receipt in the recording of revenue with respect to services already rendered, EBITDA is a useful proxy for cash flow because over an extended period of time EBITDA and cash flow should very nearly tie and EBITDA (with possible adjustments for capital expenditures and changes in working capital) is the best proxy for assessing run-rate cash flow for a business like Rural/Metro that uses accrual accounting. Accordingly, EBITDA is particularly important to note investors (like the Plaintiffs) as a tool to analyze whether a company has historically demonstrated the ability to generate enough revenues to service its debt and whether its recent, past run-rate is consistent with paying its debts on time. Moreover, as a proxy for cash flow, EBITDA is used by many investors, like cash flow is used, to value a business based on comparable companies, i.e., determining a business's value by applying a multiple (based on comparable companies) to EBITDA. For note investors (like the Plaintiffs) in particular, this valuation methodology is commonly used to determine whether a business's value exceeds its total debts, including those owed to note investors.

70.     Either for assessing the sufficiency of its cash flow or for determining the value of the business or both, all Plaintiffs considered Rural/Metro's reported historical EBITDA in assessing whether to acquire Rural/Metro's Senior Notes. Rural/Metro having EBITDA in amounts sufficient to meet its ongoing cash obligations was an essential component in Plaintiffs' investment decisions.

71.     EBITDA, as presented in Rural/Metro's financial presentations, was backward looking, not forward looking. EBITDA was consistently described as a measurement of completed events. As used in these presentations, EBITDA was a statement about whether revenues for completed transports could be properly recognized, as of past dates, as earned revenues in accordance with accounting standards requiring significant certainty with respect to accrual of revenues for completed transports. EBITDA as of a past date is not contingent on future events.

McKool Smith Hennigan, P.C.
Los Angeles, CA

While the future may involve a collection of cash different in some manner from recorded earnings imbedded in EBITDA, that future difference does not change historically recorded EBITDA. Thus, when FTI determined that a $35.2 million correction should be made to prior-period earnings, that was a statement that those prior earnings should never have been recorded based on proper accounting methods.

72. Warburg, Carney, DiMino, Rural/Metro and FTI knew the critical importance to investors of an accurate statement of Rural/Metro's revenues and EBITDA. Warburg and Rural/Metro touted Rural/Metro's use of sophisticated revenue recognition methodologies that were supposedly capable of reasonably and properly estimating revenues. Revenue recognition was among the matters identified in the June 24, 2011 Offering Memorandum as "critical to understanding" Rural/Metro's results of operations:

> **Revenue Recognition.** A significant portion of our revenue is generated in the highly regulated and complex healthcare industry . . . . *We use sophisticated financial models to estimate the provisioning for both contractual allowances and uncompensated care by looking at current service levels, payer mix known at the time of transport and incorporating historical trend information by service area.* The evaluation of these data points, along with our interpretation of Medicare, Medicaid and various commercial insurance provider rules and regulations, is highly complicated and subjective. If our interpretation or our analysis surrounding historical data is incorrect, revenue could be overstated or understated. For the year ended June 30, 2010, a 1% change in our estimate of revenue collectability would impact Rural/Metro Corporation by $9.5 million of net revenue.

THIRD AMENDED COMPLAINT

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

73.     As described above and below, Rural/Metro's revenue recognition system was flawed and unreliable and resulted in materially inaccurate reporting of the net revenue that Rural/Metro would reasonably expect to recover for its patient transports. Among other flaws, the system did not take into account current payer mix, service level mix (reimbursement rates differ depending on the level of ambulance service provided, *i.e.*, basic life support versus advanced life support) known at the time of transport, or historical trend by service area. The system also did not take into account the inability to flow through rate increases. The entire revenue recognition system was dated and unreliable. These material facts were known to Warburg, Carney, Rural/Metro, DiMino and Perez. Defendants, DiMino, Perez and Rural/Metro, however, misrepresented this information to Plaintiffs and did not disclose the true facts.

**B.      Rural/Metro's Billing and Collection Systems**

74.     Warburg, Carney, Rural/Metro and DiMino also knew that another critical aspect of Rural/Metro's operations and growth was its billing and collections capabilities. As represented in the Offering Memorandum:

> *Leading Billing and Collections Capability*:  Our focus on improved billing and collections capabilities has allowed us to reduce DSOs and decrease uncompensated care, which in turn increases APC.

75.     The Offering Memorandum further stated:

> **Our business depends on numerous complex information systems, and any failure to successfully maintain these systems or implement new systems could materially and adversely affect our operations.**

> * * *

McKool Smith Hennigan, P.C.
Los Angeles, CA

We also use the development and implementation of sophisticated and specialized technology to differentiate our services from our competitors and improve our profitability. The failure to implement and maintain operational, financial and billing information systems successfully could have an adverse effect on our ability to obtain new business, retain existing business and maintain or increase our profit margins.

76.     In fact, as described below, Rural/Metro's billing systems were flawed, unreliable and inadequate, a material fact known to Warburg, Carney, Rural/Metro and DiMino.  Defendants, Rural/Metro and DiMino, however, misrepresented this information to Plaintiffs and did not disclose the true facts.

## V.     ACQUISITIONS OF PMT AND PACIFIC BOWERS

77.     Immediately after purchasing Rural/Metro, Warburg began implementing the planned growth-through-acquisition strategy.  In September 2011, Rural/Metro entered into an agreement to purchase Pacific Ambulance, Inc. and Bowers Companies, Inc. ("Pacific Bowers"), a large provider of ambulance services in California for approximately $48 million.  The purchase was financed with a $28 million draw under a $35 million unsecured bridge loan to Rural/Metro and a $20 million equity contribution from Warburg.  The purchase was consummated in December 2011.

78.     In September 2011, Rural/Metro also entered into an agreement to purchase Professional Medical Transport, Inc. and affiliated entities ("PMT") for approximately $52 million.  That purchase was consummated in February 2012.

79.     While working on the potential acquisitions, Warburg and Carney learned that DiMino and the entire management team at Rural/Metro lacked the ability to analyze, negotiate and implement these acquisitions in a competent manner.

McKool Smith Hennigan, P.C.
Los Angeles, CA

80.     The magnitude and complexity of the two acquisitions were unprecedented for Rural/Metro.  Red flags were raised concerning the financial condition of the potential acquisitions.  Nevertheless, Rural/Metro, Warburg, Carney and DiMino concluded the acquisitions without addressing concerns raised during the due diligence.  Rural/Metro, Warburg, Carney and DiMino also failed to plan properly for integrating and failed to integrate properly the acquired companies' operations into Rural/Metro's already antiquated and defective revenue recognition, billing and collections systems.

81.     Warburg, Carney and DiMino caused Rural/Metro to complete the acquisitions notwithstanding the known risks.  To complete the acquisitions, on February 3, 2012, Rural/Metro issued an additional $108 million of 10.125% Senior Notes due 2019.  The Senior Note proceeds repaid the draw on the bridge loan utilized for the Pacific Bowers purchase, funded the PMT purchase and paid down a portion of the revolving credit facility.  Once again, Warburg sponsored and led the February 2012 private placement offering.

82.     As Warburg, Carney and DiMino could all reasonably anticipate based on what they knew before the acquisitions, the acquisitions proved financially disastrous.  Revenues were far less than estimated for both PMT and Pacific Bowers, and faulty revenue recognition procedures made it impossible for Rural/Metro to determine those revenues accurately and reliably.

83.     While the February 2012 Offering Memorandum projected that Pacific Bowers would generate monthly EBITDA of $750,000 ($9 million annually), FTI determined and reported to Warburg and Carney in April 2013 that "the run rate established at the acquisition date for Pacific Bowers overstated revenue and EBITDA.  Based on adjusted revenue post-acquisition, the monthly revenue run-rate was $2.7 million, and EBITDA was approximately break-even."  The February 2012 Offering Memorandum projected that PMT would generate monthly EBITDA of $875,000.  FTI Consulting determined and reported to Warburg and Carney in April

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

2013 that "the run rate established at the acquisition date for PMT overstated EBITDA. Based on adjusted revenue post-acquisition, the monthly revenue run-rate was $3.5 million, and EBITDA was $0.5 million."

## III. DEFENDANTS WERE AWARE OF RURAL/METRO'S FLAWED REVENUE RECOGNITION SYSTEM AND INABILITY TO DETERMINE REVENUES ACCURATELY AND RELIABLY

84. In February 2012, Rural/Metro's CFO Perez was provided a report that reflected a negative trend in the ratio of cash collections to recorded revenues. Rural/Metro was collecting a smaller and smaller percentage of its recorded revenues, strongly indicating that Rural/Metro's reported revenues and EBITDA were inflated and unreliable. Shortly thereafter, DiMino and Perez escalated the issue to Carney at a meeting in Arizona, shared the report and confirmed their shared understanding the declining ratio of cash collections to revenues revealed and demonstrated an existing problem that needed to be researched and investigated. Carney instructed Perez to "dig into" the problem and "find out" because the problem was "important" and "critical."

85. On March 7, 2012, Carney engaged in efforts to assist in resolving the revenue recognition issues. Specifically, he sent an email to Marty Rash, CEO of RegionalCare (another Warburg portfolio company), regarding the collections issue. Carney told Rash that Perez and DiMino would be calling him as Perez was trying to "measure the revenue-to-collections cycle better" and that Rural/Metro needed to "identify a third party to help us identify/fix our processes."

86. As reflected in an email exchange between Warburg's Strauss and Carney dated April 5, 2012, to address the problems, with the knowledge of Warburg and Carney, Rural/Metro CFO Jorge Perez retained Warburg's long-time advisor and consultant on Rural/Metro financial matters, the accounting firm Ernst & Young ("E&Y"), to analyze Rural/Metro's revenue recognition system and related issues.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

87.     In April 2012, after meeting with DiMino and Perez and learning about
Rural/Metro's financial systems, E&Y confirmed Warburg and DiMino's already-
existing understanding that Rural/Metro's revenue recognition methodology created a
substantial risk of misstating revenues.  In a letter emailed to Perez on April 30, 2012
(and soon thereafter forwarded to DiMino), E&Y warned that Rural/Metro was
"challenged in a couple of areas related to revenue cycle data and information," and
that:

> the current approach for analyzing revenue performance
> information is particularly risky in an environment where
> payers are generally paying less for the same services than
> they have in the past.  Because of the lag factor in the
> monthly calculation … it is difficult to detect recent
> reductions in payment levels from the payers thereby
> increasing the risk on the reserve for contractual in accounts
> receivable.

88.     E&Y also pointed out that "Rural/Metro has been experiencing a
decrease in collections over the past year" which led Rural/Metro's "executives to ask:
Is there a better way to value month end accounts receivable—ideally with more
accurate and timely accounts receivable information?  Why are collections going
down?"

89.     In May 2012, E&Y again confirmed to Rural/Metro, DiMino, Warburg
and Carney (and they agreed) that there were serious existing and unremedied
problems with Rural/Metro's revenue recognition system.  In its May 2012 retention
letter (after they had conducted an initial review), E&Y confirmed to Rural/Metro,
DiMino, Warburg and Carney (and they agreed) that the system being utilized by
Rural/Metro was:

a **risky methodology** that is subject to a level of estimates and judgment that **is not appropriate for a company of the size and scale of Rural/Metro**.

Among the multiple deficiencies identified was the fact that Rural/Metro was not

presently capturing and storing the net payment amount received from each payer for each service. Without a current and historical data base for maintaining this information, it will be nearly impossible to value the month end receivable or perform accurate profitability analysis by customer/location.

90. Throughout the summer of 2012, E&Y continued to assess the flaws in the Rural/Metro revenue recognition system and to update Rural/Metro, Warburg, Carney, Perez and DiMino on the serious flaws and issues. In September 2012, E&Y presented Warburg (and Carney) and Rural/Metro (and DiMino and Perez) a report stating that Rural/Metro's retrospective methodology for determining contractual allowances and net revenues remained "antiquated and risky." E&Y also confirmed serious existing and unremedied problems in Rural/Metro's billing and collection systems that are described below.

91. Despite their knowledge from at least May 2012 forward that Rural/Metro utilized an unreliable and flawed revenue recognition system, and that Rural/Metro could not and did not adequately determine revenues, Warburg, Carney, Rural/Metro, DiMino and Perez withheld this information from investors and potential investors, including Plaintiffs, and affirmatively misrepresented Rural/Metro's revenues and EBITDA. If Plaintiffs had known the true facts, they would not have purchased the Senior Notes at all or at the prices they paid.

92. It was not until after the Rural/Metro bankruptcy in August 2013 that Plaintiffs learned the full, true facts concerning Rural/Metro's revenue recognition

THIRD AMENDED COMPLAINT

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  system and its inability to determine its revenues and EBITDA accurately and
2  reliably.

3  **VI.   RURAL/METRO QUARTERLY INVESTOR CALLS**

4  　　　93.   After Warburg's acquisition of Rural/Metro and the issuance of the
5  Senior Notes, Rural/Metro and Warburg held quarterly investor calls to discuss
6  Rural/Metro's financial condition, operations and prospects.  Current and prospective
7  investors in the Senior Notes were invited to participate.  In connection with these
8  calls Rural/Metro current and prospective investors were given access to
9  Rural/Metro's quarterly financial statements and a written PowerPoint presentation
10  discussing the quarter's supposed financial results.  Investors were able to access
11  those written materials on Rural/Metro's Intralink site with password information sent
12  to them by Rural/Metro via an email invitation to the call.  Prospective investors were
13  also able to obtain access to the call upon request to Rural/Metro or to the
14  underwriters of the Senior Notes, who made a market in the Senior Notes as part of
15  the services they provided to Warburg in connection with the offering of the Senior
16  Notes.  During the road shows to promote the Senior Notes, Warburg committed that
17  Rural/Metro would provide quarterly conference calls for existing and prospective
18  investors.  On Warburg's behalf, the underwriters provided access to these calls to
19  prospective investors.

20  　　　94.   As Warburg, Carney, Strauss, Rural/Metro, DiMino, Perez, FTI and
21  Bingham were aware, the investor calls and materials were an important source of
22  information to both current and prospective investors, including Plaintiffs.  Investors
23  were given the opportunity to ask questions and receive answers during such calls
24  concerning Rural/Metro's financial condition, operations and prospects.  Rural/Metro
25  and Warburg met opposition from investors when they considered, in 2011, no longer
26  hosting quarterly investor calls.

27  　　　95.   Warburg, Carney, Strauss, Rural/Metro, DiMino, Perez , FTI and
28  Bingham presented false and misleading information to current and prospective

McKool Smith Hennigan, P.C.
Los Angeles, CA

27

2:15-cv-08574-PSG-MRWx

McKool Smith Hennigan, P.C.
Los Angeles, CA

investors, including Plaintiffs, during the investor calls, in the quarterly Discussion of Financial Results PowerPoint presentations and in the quarterly financial statements during the period 2012 through 2013, as described above and below. Warburg, Carney, Strauss, Rural/Metro, DiMino, FTI and Bingham withheld or misrepresented material facts concerning Rural/Metro's flawed revenue recognition system, its failure to properly book its revenues and accounts receivable reserves, and the flaws in its billing and collection systems. Warburg, Carney, Strauss, Rural/Metro, DiMino, Perez, FTI and Bingham also presented revenue and EBITDA numbers that they knew were inflated, inaccurate, unreliable and without any reasonable basis. They also failed to disclose that they had learned that the May 2013 statements were incorrect and contained misleading statements relating to Rural/Metro's revenue and EBITDA.

## VII. MISREPRESENTATIONS MADE DURING THE MAY 2012 INVESTOR CALL

96. Rural/Metro's 2012 fiscal year ran from July 1, 2011 through June 30, 2012. On or about May 15, 2012, Rural/Metro and Warburg held a quarterly investor call to discuss the Fiscal Year 2012 third quarter (January through March 2012) financial results.

97. Following Rural/Metro's internal February 2012 report reflecting a negative trend in the ratio of cash collections to recorded revenues, Carney instructed Rural/Metro's CFO Perez to investigate the important problem. By March 2012, Carney was personally involved in Rural/Metro's efforts to resolve its revenue recognition issues. In early April 2012, Rural/Metro's CFO retained E&Y to analyze and address Rural/Metro's revenue recognition system and related issues, with the knowledge of Warburg and Carney. Thus, at the time of the May 2012 investor call, Warburg, Carney, Rural/Metro, Perez and DiMino knew that Rural/Metro had a significant revenue recognition problem and that E&Y had been retained to address the problems.

98.     None of the known revenue recognition problems were disclosed to current and prospective investors during the call.  Instead, at the direction of Carney and Warburg, DiMino spoke glowingly during the call regarding Rural/Metro's supposedly increased revenues and EBITDA for its fiscal third quarter:

> [O]ur financial performance is solid and trending in a positive direction.  We are confident that our proactive organic and strategic growth platform provides ample opportunities for continued long-term growth.

99.     This statement about historical financial performance and the assertion that there had (already been) growth (that could "continue") was materially misleading.  Rural/Metro's financial performance was not trending in a positive direction.  DiMino, Perez and Rural/Metro knew, but did not disclose to investors, that the ratio of collections from Rural/Metro's base business compared to its booked revenues had been steadily decreasing, that Rural/Metro's revenue recognition system was risky and unreliable, that Rural/Metro was unable to determine its revenues in a reliable manner and that reported revenues were inflated.

100.    DiMino, Perez and Rural/Metro also deceptively focused investors' attention on increased transports, but failed to disclose that Rural/Metro did not have the ability reliably to determine revenues from those transports:  "We are pleased to see continued growth in transport volumes from continuing operations and expect this trend to continue."  Disclosure of the omitted information was necessary so that the statements concerning the (backward looking) historical increase in transport volumes and other statements about Rural/Metro's historical performance would not be materially misleading.  These disclosures were not made.

101.    As detailed above and below, Warburg and Carney controlled these misrepresentations and omissions.

McKool Smith Hennigan, P.C.
Los Angeles, CA

IV. **FROM JUNE THROUGH SEPTEMBER 2012, DEFENDANTS LEARNED OF FURTHER REVENUE AND RESERVE PROBLEMS BUT FAILED TO DISCLOSE THESE PROBLEMS AND MISREPRESENTED THE TRUE FACTS**

A. **Defendant's Knowledge of Substantial Increase to Accounts Receivable Reserves and Need for a System-Wide Overhaul**

102. In or about June 2012, Warburg and Carney learned (and DiMino, Perez and Rural/Metro learned or were already aware) that a large increase to accounts receivable reserves was required, which would reduce historical and current EBITDA, as well as reported revenues. All of them understood the significance of the problem. In one email dated June 25, 2012, Liu informed Carney:

> I spoke with Jorge for a while yesterday, reiterated how bad the situation was … . Jorge had been focused on quantifying the issue more precisely and figuring out how to allocate from an accounting standpoint.

In a subsequent email that Carney received from Strauss dated July 12, 2012, Strauss explained:

> The essence of the disconnect is that their "check" that their net AR balance is correct has historically used a collection rate that is 14 months old. Collections really started to get worse at the very end of 2010 and early 2011. So this only was factored into their "check" at the beginning of this year when Jorge and Kevin started noticing the issue.
> That being said, there are still other ways they could have known something was off such as just checking actual cash collections vs. booking, which is a test PwC should do in their audit according to Tom. However, PwC did not raise any issues in the 2011 audit even though you would have thought they would have noticed something. Similarly, as we know, Rural did not raise any issue in 2011 and I don't know why that is the case.

30

2:15-cv-08574-PSG-MRWx

As Warburg, Carney, DiMino, Perez and Rural/Metro were already aware, the existing revenue recognition system was not, as already confirmed by E&Y, reliably determining Rural/Metro's revenues and was causing inflated reported revenues and EBITDA.

103.   Given the severe financial stress confronting Rural/Metro, Warburg went into crisis mode, taking the lead in analyzing and considering possible methods to address the revenue recognition issues.  As reflected in a document attached to a June 27, 2012 email, Warburg named these efforts the "Rural Recovery Project Workplan." This extensive involvement in the day-to-day efforts to resolve Rural/Metro's revenue recognition issues reflected Warburg's and Carney's recognition that Rural/Metro's system and its personnel were incapable of generating reliable revenue data and had been producing inflated revenue numbers.  The Workplan included hiring of consultants to diagnose and quantify the revenue recognition issues:

    a.    How large is the hole in the aggregate?

    b.    How much [of the increase in reserves] is [applicable to] FY11 and prior years versus FY12[?]

    c.    How much is worsening collection rate versus forecasting methodology?

    d.    Covenant compliance headroom [before Rural/Metro would violate covenants with bank lenders].

104.   The Rural Recovery Project Workplan contemplated implementation of extensive revisions of basic financial accounting functions at Rural/Metro that were aimed at putting in place reliable accounting functions any large and reputable organization should have already had in place. In the Plan, Warburg specifically identified the need to fix the "revenue recognition" and accounts receivable systems—two critical systems that it had failed to disclose were horribly in need of repair.

105.   On July 25, 2012, Warburg's Strauss sent an email to Carney with a copy to Warburg's Liu.  The email was not sent to any employee of Rural/Metro.  The email forwarded an email chain reflecting a discussion between Strauss and

Rural/Metro's Perez. The discussion between Strauss and Perez indicated that Strauss was preparing an "internal report" to higher-ups at Warburg (Carney's superiors). The July 25th email attached Strauss's version of "Speaking Notes" for Carney to use for that internal Warburg presentation.

106. No later than July 25, 2012, as reflected in the Speaking Notes for Carney's presentation to his superiors Warburg and Carney knew Rural/Metro still needed to fix the revenue recognition and accounts receivable systems—two critical systems that Warburg, Carney, Rural/Metro, DiMino and Perez had failed to disclose were horribly in need of repair. In discussing an approximately $20 million "A/R issue," the internal Warburg presentation (in the Speaking Notes) explains: "What are we doing about it? A large number of initiatives [including] [f]ixing revenue recognition and A/R processes."

107. Warburg and Carney were aware that the management team at Rural/Metro did not have the experience or ability to resolve issues of the magnitude confronting Rural/Metro without major oversight and input by Warburg. Accordingly, Warburg and Carney directed and actively participated in day-to-day efforts to address the revenue recognition problems and overstatements.

108. During the period from June through September 2012, DiMino, Perez, Rural/Metro, Carney and Warburg continued to learn more about the magnitude of the overstatements resulting from the flawed revenue recognition system, and the inability of Rural/Metro to reliably calculate its revenues or EBITDA. Given the enormity of the issues facing Rural/Metro, as reflected in the July 25, 2012 Speaking Notes for Carney's presentation to his superiors at Warburg, plans to engage in further acquisitions (which had been fundamental to Warburg's reasons for investing in Rural/Metro) were put on ice by Warburg: "Needless to say, the Company is not looking at any acquisitions."

109. Despite these efforts, Warburg, Carney, DiMino, Perez and Rural/Metro did not correct the revenue recognition problems and continued to be unable to

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

2:15-cv-08574-PSG-MRWx

determine revenues and EBITDA accurately and reliably.  These facts were not
disclosed, and were misrepresented by Warburg, Carney, Rural/Metro, DiMino and
Perez to investors and potential investors, including Plaintiffs.

**B.     Defendants' Knowledge of Rural/Metro's Billings and Collections
Issues**

110.    By no later than July 18, 2012, as reflected in an email of that date from
Strauss to Liu, Warburg and Carney also learned that there were serious flaws in
Rural/Metro's billing and collection processes.  DiMino, Perez and Rural/Metro were
already aware of this issue.  The Warburg email stated:

> Collection issues at Rural:  Rural has seen evidence over the
> last two years of a decrease in service level mix which leads
> the company to believe that [it] is not accurately coding the
> severity level of certain transports; furthermore the company
> has discovered issues with its ability to confirm the accuracy
> of payments from payors.   These factors have resulted in
> Rural receiving less payments for certain transports than it
> expected.

111.    In a presentation in September 2012, E&Y informed Warburg, Carney,
DiMino, Perez and Rural/Metro that Rural/Metro "utilizes old software, the AS400, to
gather billing information, bill and collect receivables from all payer types.  At the
time this software was modified for use in healthcare, Rural/Metro was a considerably
smaller company and healthcare billing and collections were not nearly as complex as
they are today."

112.    The facts described in the preceding paragraphs in this section were not
disclosed to investors and potential investors, including Plaintiffs.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

**C. Defendants' Knowledge That Commercial Price Increases That Could Not Stick Were Used Misleadingly to Boost Reported Revenues**

113. By no later than June 2012, as reflected in an email dated June 29, 2012 from Warburg's Strauss to Carney and Liu, Warburg, Carney, Rural/Metro, DiMino and Perez also knew that, in an effort to boost revenues, Rural/Metro had started raising commercial prices more frequently and was basing its revenue recognition on the untenable collection assumption of "100% flow through" of the rate increases.

114. Rural/Metro's ability to increase meaningfully the prices to be paid by the various payers varied widely depending on the provisions of each payer's commercial insurance policy terms. Carney, Warburg, Rural/Metro, DiMino and Perez knew that Rural/Metro assumed, with no reasonable basis, that a much larger amount of its commercial price increases would be accepted and honored by payers than could have been reasonably expected and that this resulted in an overstatement of revenues.

115. These facts were not disclosed and were misrepresented to investors and potential investors, including Plaintiffs.

**D. Defendants' Knowledge that $17.6 Million Increase in Accounts Receivable Reserves Was Insufficient**

116. In September 2012, an adjustment of $17.6 million was recorded by Rural/Metro and taken into account in its financial statements for the fiscal year ending June 2012. Warburg, Carney, DiMino, Perez and Rural/Metro knew, however, that the $17.6 million correction was insufficient to correct the amount of receivables indicated on Rural/Metro's financial statements. As reflected in the July 25, 2012 Speaking Notes for Carney's presentation to his superiors at Warburg, Warburg, Carney, DiMino, Perez and Rural/Metro knew that additional increases in accounts receivable reserves (and therefore reductions in EBITDA) would be required, and that

McKool Smith Hennigan, P.C.
Los Angeles, CA

the reported revenue and EBITDA amounts were not accurate even after the recorded $17.6 million adjustment:

> We [Carney and Strauss, and perhaps Liu] think the magnitude of the issue is +/-$20 million—this is a direct hit to EBITDA. From an accounting perspective, we intend to book a $[14] million A/R write-down in FY Q4 2012 with <u>the remaining balance to be bled into the quarters in FY 2013</u> and thus this will be a drag on FY 2013 results. (Emphasis added.)

117. This internal Warburg presentation was based on information obtained from Perez, as indicated in the July 25, 2012 email attaching the Speaking Notes for the internal Warburg presentation. This same information was known to DiMino, Perez's direct superior.

118. In short, Carney and Strauss understood that Rural/Metro needed a $20 million increase in the reserves it used to calculate revenues and EBITDA. This $20 million increase would be a "direct hit" to EBITDA and would result in EBITDA decreasing by $20 million. Rather than honestly implementing the necessary accounting entries, Warburg and Carney directed Rural/Metro, with DiMino's and Perez's agreement, to implement only a $17.6 million reserve increase. Accordingly, EBITDA was overstated by over $2 million.

119. The Speaking Notes for higher ups at Warburg indicate that the decision had been made that the remaining $2+ million in necessary reserve adjustments would be "bled" into subsequent periods. Bleeding inflates reported results and EBITDA in one quarter, even when proper accounting methods dictate lower results. And the "bleeding" then decreases results and EBITDA in subsequent quarters. Later in the same Speaking Notes, Strauss proposed that Carney tell the higher-ups at Warburg (as

McKool Smith Hennigan, P.C.
Los Angeles, CA

Carney did) that "bleeding in the A/R write-down" would lower reported results for the next fiscal year (Fiscal Year 2013).

120.   As of July 25, 2012, "bleeding" the adjustments into future quarters meant that Rural/Metro's fourth quarter 2012 results had inflated revenue figures and made Rural/Metro's 2012 financial results appear more favorable than they actually were.  "Bleeding" a financial problem that already exists into results in subsequent periods is a fundamental fraud on investors that rely on a company's financial results and the reliability of corporate management.  Rural/Metro's fourth quarter 2012 results and its full fiscal 2012 results would not reflect economic reality.  An assessment of its ability to pay its debts and an assessment of its value based on those financial results would be misleadingly high and optimistic, and unwarranted by its actual revenues.

121.   In that same July 25, 2012 set of Speaking Notes for internal presentation at Warburg, Carney and Strauss recognized that Rural/Metro's revenue recognition and accounts receivable provisioning process were not "robust" as they should have been.  The same set of Speaking Notes indicated that the flawed revenue recognition processes had not yet been repaired.

122.   Both reported revenue and reported EBITDA are factual statements about historical matters:  What revenues are properly recorded given accounting principles regarding the required certainty for valuing accounts receivable.  Reported revenue and reported EBITDA are not forward looking statements about expected future financial results.  Bleeding a reserve used to calculate revenues into subsequent quarters means that revenues are being reported with regard to a completed time period that do not satisfy accounting principles regarding the required certainty for valuing accounts receivable.  Bleeding is a refusal to recognize a historically existing problem, and a misrepresentation about the authenticity and validity of the measurement of accounts receivable.

123.   In a September 2012 "Presentation to Warburg Pincus and Rural/Metro Corporation" entitled "Net payment and reserve process assessment," E&Y reported to Rural/Metro, Warburg, Carney, DiMino and Perez more details of the deficiencies in the Rural/Metro revenue recognition system, thus further confirming its continuing inability to calculate revenues in an accurate manner.  E&Y warned Warburg that the Rural/Metro revenue recognition system was "antiquated and risky," based on "old software," and was at odds with those of "[l]eading practice healthcare organizations [which] closely monitor net payment levels for all payers."

124.   Warburg, Carney, DiMino, Perez and Rural/Metro did not disclose these critical and material financial facts to existing and prospective investors.  Instead, Warburg, Carney, DiMino, Perez and Rural/Metro misrepresented the facts regarding Rural/Metro's financial results and condition to investors and potential investors, including Plaintiffs.

**E.     Misrepresentations Made During September 2012 Investor Call**

125.   On September 26, 2012, shortly after the E&Y "Presentation to Warburg Pincus and Rural/Metro" concerning the defects in Rural/Metro's revenue recognition system, Rural/Metro and Warburg held a quarterly investor call to discuss the financial results for the quarter ending June 2012 (fourth quarter Fiscal Year 2012).  Warburg, Carney, DiMino, Perez and Rural/Metro created the materially misleading financial presentation that was to be made during the call.  Warburg and Carney actively participated with DiMino in the preparation of both the written financial presentation provided to current and prospective investors entitled "Discussion of 4Q FY 2012 Financial Results," and the script of what was to be disclosed to current and prospective investors during the investor call.  Warburg and Carney reviewed, revised and participated in the drafting of numerous versions of the script and financial presentation, and provided extensive input on how to frame the difficult issues confronting Rural/Metro with respect to its revenue recognition system.  Warburg and

McKool Smith Hennigan, P.C.
Los Angeles, CA

Carney also provided final sign off on the script and financial presentation and ultimately controlled the content of both.

126. Warburg and Carney were also intimately involved in preparing DiMino and Perez with respect to what would be said to investors during the call, including drafting potential questions from investors and assisting in developing answers. Notwithstanding past practice, at Carney's instruction, the financial presentation slides were not provided to current and prospective investors in the Senior Notes prior to the investor call. The financial presentation slides were instead posted on the day of the call.

127. Carney personally attended the call with investors, either in person or by phone. He thought it was important to attend because the $17.6 million disclosure was "bad news." He could have spoken to correct the misinformation on the call, but he chose to remain silent.

128. While current and prospective investors were informed of the $17.6 million write-down, they were falsely told by DiMino during the call, with the knowing direction, participation, assistance and final approval of Carney and Warburg, that the $17.6 million write down was a "one-time clean-up item" that resulted from a change in payer mix, and that Rural/Metro's revenue recognition issues had been successfully remedied:

> [W]ith our new enhanced methodologies we will be able to rapidly identify any further impact from external economic changes.... We also have a significant increase in average patient charge due to the impacted revenue cycle management process, as well as our---price increases that we will normally receive during the year. We have a high confidence in the reserve estimate for anticipated collections.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

129.   This write-off was knowingly and falsely described by Rural/Metro and DiMino as a "one-time clean-up item."  Perez, Warburg and Carney did not correct this misrepresentation or provide any clarifying information.  Rural/Metro, DiMino, Perez, Warburg and Carney knew at the time of the call that the revenue recognition system had not been fixed, and that Rural/Metro would likely need additional reserves for past transports would need to be recorded in future quarters—meaning that additional reserves that should have been used in calculating revenues and EBITDA at the time of the September 2012 call would be recorded in later time periods.

130.   DiMino specifically stated that Rural/Metro's accounting system had been enhanced so that shifts in payer mix would no longer be missed.  He said that Rural/Metro's systems hadn't had "the ability to work quickly enough through these payer mix shifts," but that those systems were "now enhanced so that this won't happen going further."  In fact, those systems had not been enhanced to more rapidly recognize shifts in payer mix.

131.   Active mischaracterization of the $17.6 million write-down as a one-time event and falsely claimed improvement in the accounting systems, with accompanying silence from Warburg and Carney, were intended by Warburg, Carney, DiMino, Perez and Rural/Metro to provide false reassurance to investors that Rural/Metro had successfully resolved its revenue recognition problems.  In reviewing this write-down, Plaintiffs understood that it was the common practice when companies announced earnings revisions to disclose all problems and to move forward with clean numbers. Warburg, Carney, DiMino, Perez and Rural/Metro were aware that investors had this understanding.

132.   Investors were also falsely assured in the written investor presentation and the corresponding oral presentation by DiMino and Perez "Discussion of 4Q FY 2012 Financial Results" that "Increased Average Patient Charge (APC) [was] due to improved revenue cycle management process" and that Rural/Metro had "High Confidence in Reserve Estimate for Anticipated Collections."  Carney and Warburg

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

39

2:15-cv-08574-PSG-MRWx

THIRD AMENDED COMPLAINT

did not speak to correct these knowingly false representations. In fact, Warburg, Carney, DiMino, Perez and Rural/Metro knew that additional increases in accounts receivable reserves, an historical statement regarding the necessary amount of reserves against billings for already-completed transports, should have already been implemented to allow the recorded amount of revenues in a manner consistent with accounting standards.

133. The statements about the amount of revenues and EBITDA were materially false and misleading.

134. Warburg, Carney, DiMino, Perez and Rural/Metro knew, but did not disclose that, in fact, material additional reserves for past transports that should have been used to calculate past revenues and EBITDA would need to be recorded in future quarters (*i.e.*, padded revenues would be recognized in Rural/Metro's financial statements even though management, Warburg and Carney knew that additional reserves should be implemented). They all knew, but did not disclose that those reserves for revenues from past transports would instead be "bled" into future quarters as reductions in income as if there was an unexpected shortfall in recovery of receivables.

135. Nor did Warburg, Carney, DiMino, Perez or Rural/Metro disclose that Rural/Metro's revenue recognition system continued to be seriously antiquated, risky and incapable of reliably estimating revenues or EBITDA, and that the revenue recognition system issues had not been resolved. In fact, notwithstanding Warburg's Carney's, DiMino's, Perez's and Rural/Metro's knowledge of the flaws in Rural/Metro's revenue recognition system, Rural/Metro maintained the current antiquated and unreliable system of testing the adequacy of its accounts receivable reserves.

136. ███████████████████████████

███████████████████████████

███████████████████████████

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA



McKool Smith Hennigan, P.C.
Los Angeles, CA

137.    Investors were also told by Michael DiMino during the September 2012 call that the PMT and Pacific Bowers acquisitions were contributing favorably to revenues and EBITDA:

> As you can see on the slide, these [two] acquisitions are doing quite nicely.  [O]n an annualized basis, transports are 192,000 combined, net revenue of $92 million and EBITDA of $23 million which is--which both EBITDA and net revenue are above the pro forma schedules that we provided.

138.    In fact, DiMino, Perez, Rural/Metro, Warburg and Carney knew Rural/Metro also did not have the ability to determine accurately and reliably the PMT and Pacific Bowers revenues.  DiMino, Perez, Rural/Metro, Warburg and Carney knew that the presented revenues were likely inflated (as they indeed were).  Carney and Warburg were keenly aware of and participated in the plan to make misrepresentations and misleading statements to investors of Rural/Metro Senior Notes by misrepresenting the reliability of Rural/Metro's revenues and EBITDA.  Carney and Warburg were closely involved over a period of months with Rural/Metro,

1  DiMino and Perez in identifying the problems with Rural/Metro's revenue recognition

2  system and in the retention of E&Y to analyze and advise Rural/Metro and Warburg

3  with respect to its antiquated revenue recognition system and the need to replace it.

4  Carney and Warburg also took responsibility for participating in drafting and finally

5  approving the script and financial presentation for the September 2012 investor call

6  that included the misrepresentations concerning Rural/Metro's financial results.

7

8  **V.    FROM SEPTEMBER THROUGH NOVEMBER 2012, DEFENDANTS**

9  **LEARNED OF, BUT FAILED TO DISCLOSE AND**

10  **MISREPRESENTED, FURTHER REVENUE AND ACCOUNTS**

11  **RECEIVABLE RESERVES PROBLEMS**

12  139.   The financial problems at Rural/Metro continued to mount after the

13  September 2012 investor call, but DiMino, Perez, Rural/Metro, Warburg and Carney

14  continued falsely to portray Rural/Metro as on track to meet its financial goals, when

15  in fact it was not.  In the November 7, 2012 investor presentation call, during which

16  results were reported for the quarter ending September 30, 2012 (first quarter of Fiscal

17  Year 2013), DiMino, Perez and Rural/Metro's written presentation falsely reported

18  that Rural/Metro's EBITDA for that quarter was $26 million, which they noted was a

19  $5 million improvement over the same quarter in 2011 for Rural/Metro's continuing

20  operations.  DiMino and Rural/Metro's written presentation also falsely reported that

21  Rural/Metro's APC during the quarter ending September 30, 2012 was $416.

22  140.   By April 2013, FTI determined that Rural/Metro's actual EBITDA for

23  the quarter ending September 30, 2012 was $18 million, a full $8 million (or more

24  than 30%) less than the amount falsely represented in November 2012.  So actual

25  results for continuing operations were materially worse than Rural/Metro had reported

26  a year earlier.  By April 2013, FTI also determined that Rural/Metro's APC for the

27  quarter ending September 30, 2012 was $399.  This $17 gap between actual and

28

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

reported EBITDA was responsible for all or nearly all the shortfall between actual and reported revenue.

141. The false and inflated EBITDA and APC figures presented by Rural/Metro, DiMino and Perez were the result of Rural/Metro's financial system. As Warburg, Carney, Rural/Metro, DiMino and Perez knew, Rural/Metro's financial system continued to produce unreliable and inflated results, the system was unsuitable for a business with Rural/Metro's size, and the system needed improvements and had not been improved. As a result, Rural/Metro's and DiMino's financial presentation was knowingly false and there was no reasonable basis for it to report the results that it falsely presented.

142. As detailed below, Rural/Metro also determined that insurance reserves were also inadequate (i.e., too low) for that quarter which further lowered actual EBITDA for the quarter.

143. Consistent with the written presentation's false EBITDA and APC numbers, DiMino falsely reported:

> We [Rural/Metro] remain on track to perform the plan for 2013 and look forward to reporting second quarter results in February.

144. Warburg, Carney, Rural/Metro, DiMino and Perez were already well aware that Rural/Metro was not on track to perform to plan. As reflected soon afterward in a November 20, 2012 email exchange between Carney and DiMino regarding the October 2012 Board Report:

> While the root cause is a revenue issue, there unfortunately aren't any (or enough) near-term fixes—Athena is too far away, and we can't control the macro healthcare utilization environment. So we need to find an expense solution, even if that isn't the root cause of the problem.

In that exchange, Carney told DiMino:

> Michael - These results are very concerning. It suggests we are missing our expense targets significantly in all the key areas. We cannot let this happen. In addition, I can see from the daily reports that the volume gap is widening as compared with prior months and Q1.

DiMino responded:

> Sean
>
> The results are concerning agree. The miss is coming from the rate and volume issue more so than the expenses. I will have Kevin send a bridge for the month which will help explain. The change in the collections rates for Pacific Bowers has made a significant impact.

145. While this email exchange happened on November 20th, after the November 7th call, the facts discussed in the exchange were consistent with information known to Warburg, Carney, Rural/Metro, DiMino and Perez prior to November 7th, including information all had gleaned from the daily reports Carney referenced on November 20th and the knowledge prior to November 7th that the Athena plan to improve revenue recognition was not yet implemented.

146. Warburg, Carney, Rural/Metro, DiMino and Perez knew at the time of both the November 2012 and February 2013 investor presentations that the problems with Rural/Metro's revenue recognition system were not resolved, and that its inability to produce reliable revenue estimates continued. They continued not to disclose these problems.

147. The November 2012 investor call and presentation did not reveal the falsity of the supposedly one-time, corrective $17.6 million adjustment in the September 2012 investor presentation. While Perez referenced, "2.2 million worth of

McKool Smith Hennigan, P.C.
Los Angeles, CA

44

2:15-cv-08574-PSG-MRWx

one-time cash items" in the November 2012 call and presentation, he explained that this consisted of matters unrelated to the supposed correction of revenue-recognition issues that led to the $17.6 million adjustment to Rural/Metro's base operations (i.e., the operations unrelated to the new acquisitions). Specifically, Perez explained that the $2.2 million consisted of approximately $700,000 from the closure of an ambulette business that was part of one of the new acquisitions, $800,000 from several "adjustments" that were each in amounts smaller than $200,000 and which were not identified as relating to revenue recognition and $700,000 from a "timing adjustment" from unspecified matters that were not identified as related to revenue recognition.

148. DiMino and Perez both presented revenue and EBITDA figures that were materially false and misleading during the November 7, 2012 investor call and in the presentation. The fact the numbers were false was confirmed in April 2013 when, as described in detail below, FTI and Bingham determined that Rural/Metro's historical EBITDA had been overstated by at least $33.3 million, a portion of which was attributable to the twelve month period ending in March 2013 (thus including the numbers presented in November 2012). Warburg, Carney, Rural/Metro, DiMino and Perez knew at the time of the November 2012 investor presentation that the numbers presented were false. They knew accounts receivable reserves adjustments had still not been properly quantified and accounted for, that revenues and receivables could still not be accurately and reliably calculated and were therefore likely inflated (as they indeed were), and that the plan was to bleed additional write-downs into future quarters. They also knew that the Rural/Metro financial team was not capable of resolving the revenue recognition problems or coming up with accurate or reliable revenue or EBITDA numbers.

## VI.  FROM NOVEMBER 2012 THROUGH FEBRUARY 2013, DEFENDANTS LEARNED OF, BUT FAILED TO DISCLOSE AND MISREPRESENTED, WORSENING REVENUE AND ACCOUNTS RECEIVABLE RESERVES PROBLEMS

### A.  Defendants Learn of Deepening Revenue Problems in Early 2013

149.  By the time of the February 2013 investor call, Warburg, Carney, Rural/Metro, DiMino and Perez were aware that the collection rates at Pacific Bowers were far less than originally projected (as memorialized in a December 10 or 11, 2012 Board Presentation regarding Pacific Bowers).  While Pacific Bowers transports were close to the original pro forma estimates, its collection rate was substantially lower. Pro forma collection rate was 29.4% and its estimated actual collection rate was approximately 23.9%.  The impact of the change in collection rate was approximately $7 million.

150.  Warburg, Carney, Rural/Metro, DiMino and Perez were also aware that a high number of Pacific Bowers claims, 25% of transports or 3,800 claims, for the period February to September 2012, did not meet the medical necessity standards for Medicare.

151.  Warburg, Carney, Rural/Metro, DiMino and Perez knew that further upward adjustments to the accounts receivable reserves for Pacific Bowers were expected.  An email dated November 27, 2012 from Warburg's Strauss to Carney and Liu states:  "In the model, they [Rural/Metro's accounting team] assume they take some continued reserves the rest of the year in the amount of $1.5MM in Q2, $1MM in Q3, and $0.5MM in Q4 to catch us up on Pacific Bowers, but that will obviously be subject to covenant discussions."  The reference to covenant discussions indicated that, while they knew that further reserve adjustments were needed, Warburg, Carney, Rural/Metro and DiMino intended to keep Rural/Metro from making the necessary, and already deferred, adjustments if taking the proper adjustments would put Rural/Metro in danger of violating its financial covenants with its lenders.  Violation

McKool Smith Hennigan, P.C.
Los Angeles, CA

of financial covenants could cause lenders to seize Rural/Metro, resulting in Warburg's loss of all value in its equity position.

152. At the time of the February 2013 call, Warburg, Carney, Rural/Metro and DiMino knew that Rural/Metro's revenue recognition problems had still not been resolved and were worsening. Warburg, Carney, Rural/Metro and DiMino learned of Rural/Metro's plan to bleed an additional $15 million necessary increase in accounts receivable reserves—resulting in a parallel reduction in revenues and EBITDA. Warburg, Carney, Rural/Metro and DiMino also knew accounts receivable reserves adjustments had still not been properly quantified and accounted for, and that revenues and receivables could still not be accurately and reliably calculated and were therefore likely inflated (as they indeed were).

153. Accordingly, Warburg caused Rural/Metro to retain FTI Consulting to perform services related to revenue recognition problems, including measurement of revenues and accounts receivable reserves and calculation of EBITDA for presentation to investors. FTI's assignment was extensive and targeted all the same problems Warburg, Carney, Rural/Metro and DiMino knew had not been properly analyzed, answered or resolved for almost a year. According to a January 31, 2013 email from Liu to Carney, Carney and Warburg expected:

> [FTI is] going to answer all the key questions we've had:
> (i) how big was the "hole" in aggregate; (ii) what are the components
> of how the "hole" was created; (iii) where are we now; (iv) how much
> EBITDA did PB/PMT really generate in the first year (based on
> checking cash collections), and how does that compare to our original
> expectations; if there is a delta, why? The timeframe for answering
> these questions is 5-6 weeks. And the reason they can answer these
> questions, and no one else could before, is because they know how to
> do it and because Michael will let them get deep enough into the
> bowels of R/M that they have access to the right level of granularity.

THIRD AMENDED COMPLAINT

154.   Warburg and Carney also knew that the Rural/Metro financial team was not capable of resolving the revenue recognition problems or coming up with accurate or reliable revenue or EBITDA numbers.  Indeed, in a February 22, 2013 email to Strauss describing the unreliable nature of the financial information produced by Rural/Metro personnel and its accounting systems absent help from capable people at FTI, Liu sarcastically pointed out the absurdity of relying on financial information generated from Rural/Metro's accounting systems:  "Have you ever heard the expression GIGO [Garbage in, Garbage out]?"  Warburg and Carney, working together with FTI, were therefore in charge of measuring, managing and formulating a resolution to Rural/Metro's still unremedied financial and accounting issues.

155.   As FTI's work progressed, Warburg and Carney became aware that Rural/Metro faced another significant accounts receivable write-down and would likely not meet its Fiscal Year 2013 third quarter loan covenants.  As Liu explained in a February 25, 2013 email to Carney and Strauss:

> More importantly, . . . we remain quite concerned about A/R and
> believe the company could face another significant A/R write-down.
> As a result, we are also concerned about FY Q3 covenants.  We have
> engaged third party consultants to help us sort through and quantify
> the issues and are considering our options in terms of proactively
> approaching the banks.

**B.     Misrepresentations Made During the February 2013 Investor Call**

156.   The above-described known issues, including those discussed with regard to the November 2012 investor call, with Rural/Metro's financial systems and reported results were not disclosed to investors and potential investors.  Instead, they were misrepresented to investors and potential investors.

157.   On or about February 14, 2013 Rural/Metro held an investor call to discuss results for the quarter ending December 31, 2012 (Fiscal Year 2013 second quarter).  Warburg participated in preparing the materials and presentation for the call.

McKool Smith Hennigan, P.C.
Los Angeles, CA

Neither the need for additional write-downs nor Rural/Metro's inability to quantify or resolve its historical revenue recognition issues were disclosed during the February investor call.

158.   While DiMino disclosed on the February 2013 call that there had been a $4.5 million write-down related to Pacific Bowers and a decrease in Rural/Metro's APC, he misleadingly attributed it to the "impact of healthcare industry trends as we are familiar with" including "a continued rise in the number of self-pay accounts," and "commercial insurance . . . continuing to transition to high-deductible employer plans," and once again characterized the write-off as a one-time event.  He failed to disclose that additional write-downs were expected with respect to Pacific Bowers and failed to disclose the inability of the Rural/Metro accounting system to produce accurate and reliable revenue figures, and he made no mention of the revenue recognition system's issues.

159.   Warburg, Carney, Rural/Metro and DiMino knew that additional write-downs with respect to Pacific Bowers were expected.  They also all knew that Rural/Metro's accounting system was unable to produce accurate and reliable revenue figures.  They disclosed none of this, and caused DiMino and Rural/Metro not to disclose these problems.

160.   Similarly, none of the dire issues facing Rural/Metro were disclosed in the discussion contained in the Financial Results PowerPoint presentation for the quarter ending December 31, 2012.  The only identified "Downside Trends" were:

Continuing economic pressure increases self-pay category of receivables
New business billing processes and collection cycle.

The following "Upside Trends" were falsely and misleadingly highlighted:

Stronger transport volume
Price increase (effective Jan. 2013 going forward)
Medicare fee schedule increase (effective Jan. 2013 going forward)

49

2:15-cv-08574-PSG-MRWx

1    Billing process initiatives

2    161.   Again, the true facts were not disclosed by DiMino and Rural/Metro,

3    after direction of Warburg and Carney.

4    162.   DW learned of the above-described statements to investors by attending

5    the February 2013 investor call, reviewing the February 2013 investor presentation

6    and earlier presentations and reviewing the transcript of the February 2013 call and

7    the earlier calls.  Subsequent to the February 2013 investor call, and in reliance on the

8    false information provided to investors during that call and the 2012 calls and the

9    February 2013 investor presentation and the 2012 investor presentations and the

10   omissions of material information made during those calls and in the investor

11   presentations, from March 2013 through April 2013, DW purchased approximately

12   $23.1 million of Senior Notes.  If DW had known the true facts, it would not have

13   purchased the Senior Notes either at all or at the prices it paid and would not have

14   incurred the resulting losses.

15   **VII.   FROM FEBRUARY THROUGH JULY 2013, DEFENDANTS LEARNED**

16   **OF, BUT FAILED TO DISCLOSE AND MISREPRESENTED,**

17   **SIGNIFICANT AND FURTHER REVENUE AND ACCOUNTS**

18   **RECEIVABLE RESERVES PROBLEMS THAT ULTIMATELY LED**

19   **TO RURAL/METRO'S PUBLIC FINANCIAL COLLAPSE AND**

20   **BANKRUPTCY**

21   **A.    FTI Determines That Rural/Metro Needs to Write-Down Receivables**

22   **by an Additional $35 Million**

23   163.   FTI, through its principal and health practice expert, Bingham, undertook

24   a comprehensive examination of Rural/Metro's revenues, accounts receivable reserves

25   and revenue methodology.  Bingham is a senior managing director of FTI, and at all

26   times, was acting as agent of and on behalf of FTI.  FTI was chosen for this

27   assignment by Warburg and had performed extensive work for Warburg on other

28   matters.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

164.   FTI, like Rural/Metro and Warburg, recognized that the methodology used by Rural/Metro to determine revenue and accounts receivable reserves was flawed and inaccurate and had produced inflated revenue and EBITDA numbers.  As reflected in a March 5, 2013 FTI Board of Directors Update, FTI pointed out the same key deficiencies in Rural/Metro's model that E&Y earlier identified, including that "Rural/Metro's monthly revenue estimation does not account for payor mix," "does not accurately account for revenue growth (both organic thru price changes and thru acquisition) resulting in a material separation between recorded gross-to-net collection rate and actual collection rates," and "Rural/Metro's review of accuracy for the revenue model is not robust, only adjusting revenue through review of A/R reserves."

165.   Initially, FTI conducted a comprehensive analysis of Rural/Metro's revenues through February 2013.  FTI subsequently updated this analysis to bring it current through March 2013.

166.   As Bingham has testified, FTI determined that an additional $35.2 million needed to be added to the accounts receivable reserves as of the quarter ending March 31, 2013.  This write-down was necessary to undo the effect of overstatements of receivables and revenue for periods in the 2011, 2012 and 2013 fiscal years.  FTI so informed Carney, Warburg and Rural/Metro.  The need to make this write-down provided further confirmation that, as Warburg, Carney and Rural/Metro were already aware, Rural/Metro's financial presentations had been inaccurate for a long period of time.

**B.     Defendants Misrepresent Rural/Metro Revenues and EBITDA to Plaintiffs**

167.   On May 10, 2013, Carney (on behalf of Warburg) fired DiMino from Rural/Metro.  Shortly thereafter, Warburg appointed a new President and CEO of Rural/Metro who had previously been an Executive-in-Residence at Warburg Pincus LLC.  This new CEO was unable or unwilling to present Rural/Metro's financial situation on the May 15, 2013 call.

McKool Smith Hennigan, P.C.
Los Angeles, CA

168.   In preparation for a May 15, 2013 investor call, addressing the period ending March 31, 2013, Warburg, including its employees Liu and Strauss, prepared the written presentation materials and did so with FTI's active participation.  In particular, Warburg and FTI jointly developed and agreed to publish and present the schedule in the presentation materials that would and did falsely state that Rural/Metro's last twelve months EBITDA for the period ending March 31, 2013. Warburg, Strauss, Carney, FTI and Bingham all jointly had ultimate control over the content of Rural/Metro's May 15th written presentation (and the May 30th written presentation noted later).  Warburg controlled Rural/Metro and Rural/Metro would not publish any statement that Warburg did not approve, let alone a crucial statement regarding EBITDA.  Rural/Metro looked to Carney and Strauss for Warburg's sign-off on the May 15th written presentation (and the May 30th written presentation). Bingham and FTI also had ultimate control over the written presentation.  Warburg needed FTI to advise investors that the $35.2 million correction was the total necessary correction, and Warburg needed FTI to advise investors that the $35.2 million and $17.6 million reductions had been properly allocated between the current year and earlier periods so that a run-rate EBITDA could be determined.  Rural/Metro had only recently hired a new CFO, and the new CFO could not meaningfully speak to these issues.  Accordingly, FTI's sign-off and vigorous support of the written presentation was essential, and it shared ultimate control over the presentation's statements regarding EBITDA, particularly on page 6, where the EBITDA analysis is expressly attributed to FTI:  "EBITDA per FTI Analysis."

169.   In speaking during the May 2013 investor call and causing the circulation of the written materials for that call, Carney acted for both Warburg and Rural/Metro. He identified himself as speaking for both entities, and listed Warburg first.

170.   At all times, Carney understood that his primary loyalty was owed to Warburg, the entity that employed him before and during his time on the Rural/Metro board and that provided him with all or the vast majority of his income before and

THIRD AMENDED COMPLAINT

during his time on the Rural/Metro Board. Accordingly, at all times Carney was an agent of Warburg (in addition to sometimes being an agent for Rural/Metro) and was acting on Warburg's behalf.

171. Carney's position as managing director of Warburg was a position as an employee of Warburg. His position as chairman of the board of directors of Rural/Metro was different in kind. He was a non-executive director serving as Chairman, a non-employee role. In the ordinary course, non-executive directors (even chairmen) do not act on behalf of a corporation. Instead, non-executive directors only provide advice to a corporation's executives, or through board votes direct executives to act in accordance with particular policies. With Warburg being the 100% owner of Rural/Metro, and Carney being Warburg's lead representative, DiMino and Perez treated Carney and others at Warburg as if they were the entire Board and accepted policy directives from Carney and others at Warburg as if they came from an entire Board. This included policy directives to create and present fraudulent financials and to misrepresent Rural/Metro's financial condition and the state and reliability of its financial systems, particularly with regard to revenue recognition.

172. On the May 2013 noteholder call, Carney acted for both Warburg and Rural/Metro. Acting for both entities, he presented fraudulent financial information, particularly regarding Rural/Metro's EBITDA. To serve the interests of Warburg and expressly representing Warburg, Carney informed investors that Warburg would not need to make additional equity contributions to Rural/Metro.

173. In working with FTI and Bingham to prepare the EBITDA-reporting materials for the May 15, 2013 written presentation, Strauss acted only for Warburg. He was not an employee of Rural/Metro.

174. As Warburg, Carney, Strauss, Rural/Metro, FTI and Bingham knew, investors and potential investors in Senior Notes would rely on the oral and written presentations, particularly the EBITDA presentations, in making investment decisions.

53

2:15-cv-08574-PSG-MRWx

1  Plaintiffs reviewed the EBITDA presentations prior to all their subsequent purchases
2  and relied on it for those purchases.

3      175.   For Rural/Metro and themselves, Warburg (through Carney) and FTI
4  (through Bingham) orally presented the key financial information during the call.
5  Carney started the investor call by announcing that he was a "partner at Warburg
6  Pincus and also the Chairman of the Rural/Metro Board."

7      176.   In the oral and written presentations on May 15, 2013, Warburg, Carney,
8  Strauss, Bingham, FTI and Rural/Metro discussed the amount of additional accounts
9  receivable reserves required, the Rural/Metro revenues and EBITDA for the last
10  twelve month ("LTM") period ending March 31, 2013.

11      177.   Carney, Warburg, Strauss, Rural/Metro, Bingham and FTI knew that it
12  was imperative that they represent to current and potential investors that the Last
13  Twelve Months EBITDA number was at least $70 million.  If Rural/Metro did not
14  have at least $70 million in EBITDA, investors would have known that Rural/Metro
15  would be unable to meet its annual cash requirements and would be unable to continue
16  as a viable business without going through a bankruptcy or some other form of major
17  financial restructuring, which would dramatically reduce the value of the Senior
18  Notes.  Warburg and Carney wished to avoid acknowledging the need for a
19  bankruptcy or major restructuring because that would cause their position in
20  Rural/Metro to be wiped out, with no chance of recovery.

21      178.   During the May 2013 noteholder call, Rural/Metro's interim CFO
22  confirmed the pivotal importance of a $70 million EBITDA to Rural/Metro's ability
23  to operate without a major restructuring and its ability to pay its bills on time:
24  "[W]e're operating on a basic break even on cash.  So I think it was $70 million we
25  showed you before, in the high 70s is what the run rate will be going for at a minimum
26  and that's what we need to break even cash [basis]."  Thus, FTI, Bingham, Warburg,
27  Carney, Strauss and Rural/Metro were all aware that it was of critical importance to
28  Rural/Metro's ability to continue as a business and to maintain the support of the

McKool Smith Hennigan, P.C.
Los Angeles, CA

54

2:15-cv-08574-PSG-MRWx

1    investors, and that it was critical to Warburg's attempt to salvage its investment, that

2    Rural/Metro have and report an EBITDA number of at least $70 million.

3        179.   The written materials, as presented to investors and as prepared by

4    Warburg, Rural/Metro and FTI, stated a Last Twelve Months EBITDA number of

5    $70.1 million.  The oral presentation was parallel.

6        180.   The written materials included page 6 of Rural/Metro's Discussion of Q3

7    FY2013 Financial Results.  That full written presentation is attached to this Complaint

8    as Exhibit B.  Bingham and others at FTI worked with Strauss and others at Warburg

9    in reviewing and finalizing the precise words and numbers that were presented to

10   existing and potential investors using that page, page 6 of Exhibit B.

11       181.   In response to Warburg's (Strauss's) request, Bingham and FTI agreed to

12   present orally the EBITDA calculation that was set forth on what eventually became

13   page 6 of Exhibit B on a May 14, 2013 call with Rural/Metro's bank lenders.

14   Bingham agreed to do so for that call and also for the May 15, 2013 call with existing

15   and potential noteholders.

16       182.   In the written presentation, Page 6 presented the "3/31/13 LTM EBITDA

17   per FTI Analysis," *i.e.*, FTI's analysis of Rural/Metro's EBITDA for the twelve

18   months that had ended on March 31, 2013.  After reviewing and finalizing page 6,

19   Bingham and FTI agreed to put FTI's name on the page in two places.  In addition to

20   putting its name on the page two times, FTI orally presented on that page four specific

21   numbers that presented an erroneous and misleading picture of Rural/Metro's

22   financial condition.

23       183.   As indicated in the transcript of the May 15, 2013 call, Carney stated that

24   FTI had determined that Rural/Metro's old methodology for recording revenues had

25   overstated its historical revenues by approximately $35 million due to an inadequate

26   reserve in calculating accounts receivable.  Carney further stated: "FTI has also

27   determined Rural/Metro's LTM EBITDA to be $70 million based on cash

28   collections."

McKool Smith Hennigan, P.C.
Los Angeles, CA

184. Specifically, Mr. Carney stated:

> FTI developed the $35 million change in AR reserve—and we're confident that this properly quantifies and addresses Rural/Metro's accounts receivable issue—and FTI has also determined Rural/Metro's LTM EBITDA to be $70 million based on cash collections.

185. The written discussion of financial results that Bingham and Strauss jointly finalized and approved and that Rural/Metro provided to investors, including Plaintiffs, similarly stated that "FTI has determined Rural/Metro's LTM [last twelve months] EBITDA to be approx. $70 million."

186. As was confirmed at multiple other points on the May 15th call, the $70 million figure was supposed to be a measurement of FTI's "run rate" EBITDA. Run rate EBITDA is a specific measure routinely used by investors as a proxy for cash flow to assess both the value of a company (using a multiplier analysis) and its ability to pay its obligations as they come due. While EBITDA is not a statement of cash flow because cash receipts and revenue expenditures generally do not occur precisely in the quarter in which EBITDA is measured, EBITDA is nonetheless a proxy for operating cash flow because over an extended period of time EBITDA should approximate cash flow from operations.

187. Carney's statement, and the parallel statements by Bingham, FTI, Strauss, Warburg and Rural/Metro, regarding FTI's determination and Rural/Metro's EBITDA were false. FTI's finalized, detailed, month-by-month analysis determined that Rural/Metro's EBITDA was $64 million. Worse still, Rural/Metro's EBITDA was actually less than $64 million.

188. Carney, Strauss, Warburg, Bingham, FTI and Rural/Metro were all aware that Carney's statement regarding $70 million in EBITDA was false. Bingham had directed FTI's completed, detailed analysis, FTI had presented that analysis to Strauss, Carney, Warburg and Rural/Metro, including the fact that FTI's analysis indicated that

McKool Smith Hennigan, P.C.
Los Angeles, CA

Rural/Metro's EBITDA was $64 million. When other Warburg employees learned of this important $64 million calculation, they informed Carney, prior to the May call, of the $64 million EBITDA calculation.

189. Having stated that FTI had calculated that Rural/Metro's EBITDA for the twelve months ending March 31, 2013 was $70 million, Carney promptly turned the floor over to Bingham. Bingham did not correct Carney's misstatement. Instead, he confirmed its accuracy and omitted from his multiple oral presentations throughout the May call that Carney's statement was false.

190. Shortly after Bingham spoke for the first time, Carney spoke and explained to existing and potential investors that Bingham would "walk through how we looked at the LTM EBITDA on a cash basis." Carney contrasted this cash basis analysis, the kind desired by investors, with the modified ( sometimes called "pro forma") analysis that Rural/Metro and its bank lenders had agreed could be used for determining whether Rural/Metro was in compliance with bank covenants.

191. Bingham then spoke regarding Exhibit B. He first stated, "On page six you'll see that the reported LTM adjusted EBITDA is $90.6 million." As Plaintiffs presently understand the facts, Rural/Metro's un-updated, inaccurate accounting system indicated that Rural/Metro's adjusted EBITDA for the twelve months ending March 31, 2013 was $90.6 million. The pivotal question was by how much that number needed to be reduced, for reserve and receivable adjustments, to make it accurate and reliable.

192. There were two components to making that reduction. First, as discussed earlier, Rural/Metro had already determined that it needed to make a $17.6 million reduction to past earnings, revenue and EBITDA during a period ending June 2012. The final three months of that period fell within the twelve months ending March 31, 2013 for which FTI was measuring EBITDA. No portion of that $17.6 million had been taken into account in calculating the $90.6 million EBITDA figure. Accordingly, a determination needed to be made regarding the portion of the $17.6

McKool Smith Hennigan, P.C.
Los Angeles, CA

million that should be allocated as a reduction to revenue, earnings and EBITDA to the quarter ending June 30, 2012.

193.   The second component for the necessary reduction was the allocation of the additional $35.2 million reduction to past earnings, revenue and EBITDA that FTI had determined Rural/Metro needed to make for a period of years ending March 31, 2013.  FTI completed the work determining the $35.2 million, with an allocation by month, in April 2013.  As Bingham testified in December 2013, the analysis that FTI had undertaken had been completed by FTI "eight months" earlier and had not subsequently been changed by FTI.

194.   Bingham also presented orally and in writing that $35.2 million number on page 6 of Exhibit B.  Bingham was correct that FTI had concluded in its detailed analysis that an additional $35.2 million decrease in revenues and EBITDA was required.

195.   With the $90.6 million figure established for the twelve months ending March 31, 2013, the $17.6 million reduction established for periods ending June 30, 2012 and the additional $35.2 million reduction established for multiple years ending March 31, 2013, the pivotal issue was determining the portion of the $52.8 million in total reductions that was allocable to the twelve months ending March 31, 2013.

196.   In April 2013, before the May 2013 call, FTI had finalized its analysis of this allocation as part of its determination of the $35.2 million reduction.  That analysis, set forth in spreadsheets created by FTI, established that $27 million of the $52.8 million should be allocated to the twelve months ending March 31, 2013.  Accordingly, FTI's finalized analysis indicated that Rural/Metro's EBITDA for the period ending March 31, 2013 should be $63.6 million.

197.   During the call, Bingham explained that FTI's detailed analysis of the allocation of the $17.6 million reduction and the $35.2 million reduction could be calculated in two pieces and falsely stated that those two pieces totaled $20.4 million, with a resulting twelve month EBITDA of $70 million.

McKool Smith Hennigan, P.C.
Los Angeles, CA

198.   On page 6 and in the oral presentation of page 6, Bingham indicated (as he, Strauss and Rural/Metro) indicated in the written materials) that the "first piece" was the allocation of the $17.6 million and that "portion" allocable to "Q4 2012" and therefore to the first three months of the twelve months ending March 31, 2013 was negative 4.4 million dollars.

199.   Specifically, referencing the $4.4 million figure on page 6, Bingham stated:

> The first piece that we abstracted from there [i.e., deducted from the $90.6 million systems-generated EBITDA], as you're aware, the company posted a $17.6 million adjustment last June.  All this [$4.4 million figure] does within that is quantify that [allocable portion] within the piece that related to the fourth quarter of fiscal '12 – and that's the only quarter of '12 that's still in our trailing 12 months.

200.   Regarding the allocation of the $35.2 million reduction, Bingham explained, on page 6 and in the oral presentation of page 6, that the portion allocable to the twelve months ending March 31, 2013 could be calculated by taking the total $35.2 million reduction (which covered multiple years) and reducing it by the portion of that reduction that was allocable to periods ending March 31, 2012 or earlier.  This latter figure he stated was $19.2 million.  Accordingly, the portion of the $35.2 million allocable to the last twelve months was $16 million ($35.2 million less $19.2 million).

201.   Specifically, Bingham stated: "AR was overstated by approximately $35 million" and that, "[b]ased on our analysis and look back, we were able to determine that $19.2 million of that [additional $35.2 million reserve] in fact related to periods prior to 12 months ended 03/31, which gets you to the run rate of approximately $70.1 million."

McKool Smith Hennigan, P.C.
Los Angeles, CA

202.   Having misrepresented that the allocation of the $52.8 million in corrections was $20.4 million ($4.4 million plus $35.2 million less $19.2 million) when it actually had been finalized at $27 million, Bingham also misrepresented the run rate of approximately $70 million that FTI's completed math indicated was approximately $64 million.

203.   This oral presentation of an historical $70.1 million EBITDA was repeated in writing in the presentation prepared, and provided to investors, by Bingham, FTI, Strauss, Warburg and Rural/Metro.  This written presentation was knowingly false and misleading.

204.   Even though FTI's completed, detailed analysis indicated an EBITDA of approximately $64 million, Bingham orally presented page 6 of Exhibit B, as finalized by Strauss and Bingham, on the May call.

205.   When FTI finalized its analysis and allocation in April 2013, in advance of the May noteholder call, FTI informed Carney, Strauss (who relayed the information to Carney), Warburg and Rural/Metro that FTI's detailed analysis calculated an EBITDA of approximately $64 million for the twelve months ending March 31, 2012.  Accordingly, every time Bingham, FTI, Carney, Strauss, Warburg or Rural/Metro presented any number or series of numbers that indicated an EBITDA of $70 million in the May call or in the corresponding written presentation, Bingham, FTI, Carney, Strauss, Warburg and Rural/Metro knew that number, and any related series of numbers showing arithmetic generating $70 million, were false and misleading.

206.   Carney, Bingham and Rural/Metro also omitted to state the truth when Carney and Bingham each orally stated the false $70 million number.  Bingham failed to present truthful information even when Carney represented that the $70 million number had been determined by FTI.

207.   Warburg, Carney, FTI, Bingham and Rural/Metro also told investors and potential investors that the entire amount of needed accounts receivable reserves for

THIRD AMENDED COMPLAINT

McKool Smith Hennigan, P.C.
Los Angeles, CA

the last twelve months was taken into account in the $70 million EBITDA number that was presented.

208. Warburg, FTI, Bingham and Rural/Metro told the investors and potential investors that they were confident that the adjusted revenue and EBITDA figures were accurate.

209. All of these oral and written statements regarding the amount of corrections allocable to the last twelve months and the EBITDA in the last twelve months were false. Bingham, FTI, Strauss, Warburg and Rural/Metro knew that FTI's completed, detailed month-by-month analysis indicated that the portion of the $52.8 million allocable to the twelve months ending March 31, 2013 was $27 million, with a resulting $64 million last twelve months EBITDA as of that date.

210. Bingham (for FTI), Strauss (for Warburg) and Carney (for Warburg and Rural/Metro) all jointly agreed that page 6 of the written presentation would provide a false $70 million EBITDA figure. The final content of page 6 was approved by Carney, Strauss and Bingham, and would not have been presented without approval of each of them. They all knew that the EBITDA for the twelve months ending March 31, 2013 was no more than $64 million (not $70 million), with $27 million (rather than $20.4 million) of the identified corrections allocated to the twelve months ending March 31, 2013.

211. When Bingham stated that the allocation of the $52.8 million in corrections by FTI produced a "run rate [EBITDA] of approximately $70.1 million," that statement was knowingly false and misleading. When Bingham later in the May call stated that FTI's analysis established an "EBITDA run rate of the $70 million," that statement was also knowingly false and misleading.

212. When asked by an investor on the May 15th call, "Are you guys able to say whether you [Warburg] would contribute additional equity if need be?" Carney, on behalf of Warburg and himself, falsely replied, "No reason to. The company's in perfectly good liquidity position." Warburg and Carney knew that, in fact,

Rural/Metro was dangerously close to running short on liquidity and that the FTI-calculated run-rate EBITDA of $64 million indicated that Rural/Metro was likely to encounter a cash shortfall in the next several months that would require either a liquidity infusion or a debt restructuring.

213. Before Bingham agreed to present and then presented page 6, FTI had, in April 2013, finalized the schedules allocating the two EBITDA corrections by month across multiple years. Those schedules indicated that FTI had determined that the proper allocations in the preceding twelve months totaled $27 million, not $20.4 million.

214. Thus, when Bingham, FTI, Carney, Strauss, Warburg and Rural/Metro presented the $70 million erroneous EBITDA figure, the error was in the components that Bingham and FTI had finalized, with respect to the allocation of the $35.2 million and $17.2 million corrections across time periods.

215. Indeed, a "roll forward" analysis confirmed the error in the $70 million EBITDA figure. Regarding a twelve month period ending one month earlier (March 1, 2012 to February 28, 2013), and using FTI's analysis of the allocation of the total reductions attributable to overestimates of earnings for that period, Rural/Metro and FTI had calculated before May 2013 a last twelve months EBITDA as of February 2013 of $70 million. To move forward to a last twelve months EBITDA as of March 2013, Rural/Metro needed to remove its EBITDA for March 2012 and add its EBITDA for March 2013. This process is called a "roll forward," where the most recent month is added and the month a year earlier is deducted. FTI's finalized schedules through March 2013 in April or the first few days of May, before the May lender and investor calls. Those finalized schedules established that Rural/Metro's EBITDA for March 2013 was $6 million less than its EBITDA for March 2012. Thus, the "roll forward" to March 2013, based on schedules FTI had finalized before the May 2013 presentations established that Rural/Metro's EBITDA for the twelve months ending March 31, 2013 should have been $6 million less than its EBITDA for

THIRD AMENDED COMPLAINT

the twelve months ending February 28, 2013. With February's EBITDA being $70 million, the EBITDA for March should have been presented as $64 million. FTI, Bingham, Warburg, Strauss, Carney and Rural/Metro nonetheless presented it as $70 million.

216. Despite Bingham's, Warburg's, Carney's and Rural/Metro's knowledge that FTI's completed, detailed analysis indicated an EBITDA of approximately $64 million for the last twelve months ending March 31, 2013, Warburg, Strauss, Carney, FTI and Bingham jointly prepared the written page 6 slide, and Bingham (on behalf of FTI) agreed to present the slide. On May 9, 2013, Strauss of Warburg asked Bingham by email to orally present to lenders a slide containing the math indicating that the $90 million EBITDA figure should be adjusted to $70 million based on FTI's analysis. While both Strauss and Bingham knew that FTI's analysis actually indicated an EBITDA of $64 million, Bingham nonetheless agreed to orally present the misleading slide. At Warburg's request, Bingham subsequently agreed to present and did present the analogous page 6 of Exhibit B on the May call with its parallel, false and misleading presentation of the $70 million EBITDA figure and the false and misleading allocation to the twelve months ending March 31, 2013 of $20.4 million of the $52.8 million in revenue, earnings and EBITDA reductions. Strauss was not an employee of Rural/Metro. Strauss was only an employee of Warburg. Accordingly, it was Warburg requesting FTI and Bingham to make the false presentation.

217. FTI and Bingham were motivated to knowingly misrepresent Rural/Metro's financial state in order to continue to maintain FTI's (and Bingham's) profitable relationship with Warburg.

218. Plaintiffs reviewed Carney's, Warburg's, Strauss's, Bingham's, FTI's and Rural/Metro's misrepresentations and omissions (of the true EBITDA) prior to their subsequent purchases and reasonably relied on those representations in making those purchases.

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

219.   On approximately May 14, 2013 in a call with Rural/Metro's bank lenders, Warburg, FTI and Rural/Metro had knowingly misled those lenders with the same false information, particularly the false assertion of $70 million in EBITDA.  On May 14th, Warburg, FTI and Rural/Metro presented the lenders with financials that misallocated approximately $6 million of reserves to periods earlier than the last twelve months and thus misrepresented Rural/Metro's historical, run rate EBITDA as $70 million rather than $64 million.  On information and belief, the lenders would not have provided Rural/Metro relief from its loan covenants if Rural/Metro had properly reported its earnings and EBITDA.  While $70 million in EBITDA was sufficient to justify relief, $64 million would likely not have been as that lower figure would have indicated a substantial likelihood that Rural/Metro would not be able to pay its debts as they came due.  An unforgiven violation of an unmodified covenant would have allowed Rural/Metro's lenders to force it into bankruptcy, likely causing Warburg to lose all the value of its investment.

220.   On or about May 30, 2013, the false financial data presented during the May 15, 2013 investor presentation, including the incorrect $70 million EBITDA number and the incorrect $20.4 million in allocations to the twelve months ending March 30, 2013, was repeated and reconfirmed in supplemental financial materials prepared for and forwarded to investors by Rural/Metro, with the participation and final approval of Warburg, Carney, Strauss, Bingham and FTI.  That presentation is attached as Exhibit D.  Warburg, Strauss, Carney, Bingham and FTI actively participated in the preparation of the supplemental financial materials, including the drafting, review and revision of such financial materials.  The final content of those slides was approved by Carney, Strauss and Bingham, and would not have been presented without approval of each of them.

221.   The statements made at the May 15, 2013 investor presentation and reconfirmed on or about May 30, 2013, including the presentation about the Rural/Metro revenues and EBITDA number, were untrue and were materially

inaccurate and misleading. Warburg, Strauss, Carney, FTI, Bingham and Rural/Metro

knew that the proper Rural/Metro EBITDA number for the twelve months ending

March 31, 2013 was actually no more than $64 million.

222. Bingham testified in a deposition that prior to the May 15, 2013 investor

call, he told Warburg's Strauss (apparently by email) that the correct EBITDA number

would be in the range of $64 million, based on work FTI had finalized in April 2013.

> Q: We were discussing the EBITDA calculation
> that you did, and I think you said that your EBITDA
> calculation that you provided was approximately $64
> million. Do you recall that?
>
> Bingham: As it relates to March [2013].
>
> Q: As it relates to March. And did you provide
> that number and backup to Warburg and to Rural/Metro
> management?
>
> Bingham: It was a response to Jacob [Strauss at Warburg].
> I do not recall if Rural/Metro management was copied on
> that.
>
> Q: Okay. So, you provided that to Mr. Jacob
> Strauss at Warburg?
>
> Bingham: Yes.
>
> Q: And was that prior to giving the 3/31/13
> presentation in May?
>
> Bingham: Correct.

223. On May 9, 2013, consistent with the information FTI and Bingham had

provided to Strauss and Warburg, Strauss prepared a draft of the May 15th

presentation slide reflecting the $64 million EBITDA figure that resulted from FTI's

final analysis of the allocation across time periods of the two revenue recognition

corrections: the $17.6 million previously identified correction and the additional

2:15-cv-08574-PSG-MRWx

$35.2 million correction FTI had identified.  While the presentation was a draft, $64 million was the figure that resulted from  FTI's already finalized, prior analysis.  The draft correctly reflected that FTI's completed analysis indicated that a total of $27 million of the $52.8 million in total corrections was allocable to the twelve months ending March 31, 2013, (11 million plus 35.2 million less 19.2 million).

224.   Warburg, Strauss, Carney, FTI, Bingham and Rural/Metro, however, altered the EBITDA number in the final presentation to reflect a higher and inaccurate level of EBITDA exceeding $70 million.  On May 15, 2013, Warburg, FTI (through Bingham) and Rural/Metro presented the inaccurate $70.1 million EBITDA number to investors, including Plaintiffs.

225.   Warburg, Carney, Strauss, FTI, Bingham and Rural/Metro knew, or were deliberately reckless in not knowing, that this number was overstated by more than $6 million and that the portion of the $52 million allocable to the trailing twelve months was understated by more than $6 million.  Warburg, Carney, Strauss, FTI, Bingham and Rural/Metro had no reasonable grounds for presenting the inflated $70 million number or understating the allocation of a portion of the $52 million as an accurate statement of Rural/Metro's financial results or condition.  The financial analysis that FTI had prepared in April 2013 and that FTI had finalized and provided to Warburg and Rural/Metro in April 2013 indicated that Rural/Metro's actual Last Twelve Months EBITDA as of March 31, 2013 was less than $64 million with an allocation of $27 million of the $52 million correcting reduction.

226.   Attached as Exhibits B and C are the May 2013 investor presentation and transcript of the May 15, 2013 investor call.

227.   The inaccurate EBITDA number and the inaccurate allocations to the twelve months ending March 31, 2013 were presented by Defendants with the intent to induce reliance by actual and potential investors including Plaintiffs.

228.   Warburg, through various employees, directed and prepared the misstatements in order to pacify lenders and investors in an attempt to salvage its

THIRD AMENDED COMPLAINT

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

investment in Rural/Metro by delaying the recognition of the need for a bankruptcy reorganization that would result in the loss of Warburg's equity.

229. While Warburg, Carney, Strauss, FTI, Bingham and Rural/Metro succeeded in delaying the full public recognition of Rural/Metro's financial problems, the May 15, 2013 disclosure of the need for a further EBITDA adjustment and of run-rate EBITDA of only $70 million caused the Senior Notes to trade below par, at the prices indicated in Exhibit A.

**C.    Defendants Fail To Disclose To Actual and Potential Noteholders and Correct Their May Misstatements of Rural/Metro Revenues and EBITDA**

230. After presenting the false information to the noteholders, Warburg, Carney, Strauss, FTI, Bingham and Rural/Metro compared the correct EBITDA analysis with the false information provided. By June 16, 2013, they all concluded that their May 2013 presentation was false. Nevertheless, they never disclosed or corrected the misstatements made to actual and potential noteholders.

231. Because EBITDA is a proxy for operating cash flow, $70 million or more in annual, run-rate EBITDA should have resulted in operating cash flow of roughly $6 million per month. This was approximately the amount of operating cash flow that was necessary for Rural/Metro to pay the interest on its debt as it came due. In early June 2013, Rural/Metro needed to be accumulating cash to make a June interest payment to its bank lenders and a July 15 interest payment to its noteholders.

232. As noted above, Defendants and Rural/Metro knew that, for the twelve months ending March 31, 2013, Rural/Metro's EBITDA was $64 million or less before they falsely represented it was $70 million on May 15, 2013. But, even if they did not know that, they certainly knew by mid-June 2013, as set forth below, that Rural/Metro's EBITDA was approximately $55 million for the twelve months ending March 31, 2013 and that March 2013 had an EBITDA of less than $4 million, notwithstanding the false representations on May 15, 2013. █████████

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA



$64 million in EBITDA was not enough to permit Rural/Metro to pay its debts as they came due. And Rural/Metro's actual EBITDA was actually even less as a result of Rural/Metro under-reserving for its insurance reserves. Specifically, as of March 31, 2013, Rural/Metro's insurance reserves were understated by $8.9 million for the twelve months ending March 31, 2013. As a result, cash flow by early June 2013 at Rural/Metro indicated that EBITDA was approximately $55 million to $57 million through March 2013. This difference was highly material to Rural/Metro and its noteholders.

McKool Smith Hennigan, P.C.
Los Angeles, CA

2:15-cv-08574-PSG-MRWx

THIRD AMENDED COMPLAINT



THIRD AMENDED COMPLAINT



2:15-cv-08574-PSG-MRWx

THIRD AMENDED COMPLAINT

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

█████████████████████████████████████████

███████████

249.    Despite their certainty that the historical run rate EBITDA figure they had presented to actual and potential noteholders on May 15, 2013 was false, Carney, Strauss, Warburg, Rural/Metro, FTI and Bingham did nothing to correct it.  They did not disclose to actual and potential noteholders that the true Last Twelve Months EBITDA ending in March 2013 was in fact $55 million or even that based on the information and analysis they already knew as of the May misstatements, they should have stated an EBITDA figure of $64 million.  Instead, they continued to conceal the truth from the investors, including the Plaintiffs, rather than correct their prior misrepresentations.

250.    Deciding to inform part of its financial backers but not all, on approximately June 27, 2013, Rural/Metro, Warburg and Carney admitted to Rural/Metro's bank lenders, in a presentation that was not shared with actual and potential noteholders, that the March 31, 2013 revenue and EBITDA numbers presented to investors had been grossly overstated, and that the true EBITDA number as of March 31, 2013 was only $55 million, rather than the previously reported $70 million.

251.    They explained that the March 2013 "roll-forward" was negative $6 million against a $70 million EBITDA for the twelve months ending February 28, 2013.  Thus, before taking into account additional adjustments that Rural/Metro claimed that it identified after its mid-May 2013 presentations, Rural/Metro and Carney admitted that they should have stated an EBITDA figure of $64 million for the last twelve months ending March 31, 2013.  The June 2013 presentation regarding the negative $6 million "roll forward" from the twelve months ending February 28, 2013 to the twelve months ending March 31, 2013 was an admission that the $70 million figure had always been false.  The June 2013 presentation addressed the same historical period, and its statement regarding the $70 million EBITDA through

McKool Smith Hennigan, P.C.
Los Angeles, CA

THIRD AMENDED COMPLAINT

February 2013 and regarding the negative $6 million roll-forward for March 2013 was based on the FTI analysis that had been finalized before the May 2013 presentation. Those figures did not result from new information identified or finalized after the May 2013 presentation.

252.    However, Rural/Metro, FTI and Warburg did not inform investors in the Senior Notes of any of the May misstatements until later, after further purchases by Plaintiffs.

253.    When asked about the June 2013 presentation that identified to lenders that the previously-presented $70 million EBITDA figure should have been $64 million, Bingham testified in December 2013 that FTI provided to Warburg FTI's work related to revenue recognition and the resulting numbers regarding allocation of the $52.8 million in earnings reductions. He testified that "those numbers have not changed. Eight months later they have not changed." Eight months before December 2013 was April 2013, when FTI completed the work allocating the $52.8 million.

254.    Bingham could have provided an errata to his deposition if he misspoke or if he contended that he was mis-transcribed, but he never did so.

255.    Neither FTI nor Warburg have produced the email referenced by Mr. Bingham in his testimony that is referenced above in Paragraph 221.

256.    As noted above, the May 15, 2013 representations of $70 million in EBITDA for the twelve months ending March 31, 2013 was also overstated because of an insurance reserves issue. Based on data available to Rural/Metro well before May 15, 2013, Rural/Metro should have reserved an additional $8.9 million for accrual of its insurance obligations. This reduced EBITDA for the twelve months ending March 31, 2013 by an additional $8.9 million in addition to the more than $6 million issue discussed above.

257.    Before June 27, 2013, Rural/Metro, Warburg, Carney and FTI had concluded that, based on information available to them before May 15, 2013, they all should have presented an EBITDA of roughly $55 million. They did not disclose and

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  correct this information to actual and potential noteholders including the Plaintiffs

2  before Plaintiffs' purchases after June 27, 2013.

3      258.  Defendants decided to disclose this information only to Rural/Metro's

4  bank lenders. On June 27, 2013, Rural/Metro, still under the control of Warburg and

5  Carney, made a presentation to its bank lenders that revealed that the EBITDA

6  through March 31, 2013 that was presented as $70 million should have been presented

7  as $55 million. Rural/Metro disclosed that the presented EBITDA should have been

8  reduced by $6 million based on FTI's methodology and Rural/Metro's data for

9  measuring revenues and by $8.9 million for insurance accruals.

10      259.  Rural/Metro further revealed that it continued to have a significant lack

11  of confidence in its EBITDA measurements. It therefore indicated a wide range of

12  estimated EBITDA. "The company now believes its [trailing twelve months]

13  EBITDA is in the range of $50 [million] to $60 [million]."

14      260.  Defendants also stated that the actual situation was worse. They told

15  Rural/Metro's bank lenders: "Recent monthly performance is below this range." On

16  June 27, 2013 when this presentation was made, Defendants were aware that recent

17  months including March 2013 had EBITDA below $4 million per month according to

18  Rural/Metro's best available information before May 15, 2013. Even correcting only

19  for the misrepresentation of the best revenue information available from FTI's

20  methodology, Rural/Metro's March 2013 EBITDA was $4 million. With the

21  correction for insurance reserves based on information available before May 15, 2013,

22  March 2013 EBITDA was below $4 million.

23      261.  This presentation was not made to actual or potential noteholders or

24  publicly revealed to them. Thus, Defendants did not disclose and correct their prior

25  misstatements to actual and potential noteholders despite recognizing that they had

26  falsely presented historical facts as of March 31, 2013 when they made their

27  presentations on May 15, 2013. Defendants kept this information secret despite

28

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

recognizing that it was highly material, with actual EBITDA being a "lot less" than they had presented and despite concluding that they should share it with bank lenders.

262.   If the EBITDA numbers for the twelve months ending March 31, 2013, including the terrible March 2013 monthly EBITDA, had been accurately represented on May 15, 2013 or disclosed as corrected on or after June 13, 2013 (to the extent it was only later accurately determined), Plaintiffs would not have invested or made further investments in the Senior Notes at the prices they paid.

263.   Prior to making their subsequent purchases, Plaintiffs learned of the above-described May 15, 2013 statements to investors by attending or listening to the tape of the May 2013 investor call, by reviewing the investor presentation and by reviewing the transcript of the call.  Subsequent to the May 2013 investor call, and in reliance on the misrepresentations provided to investors during the call and in the May 2013 investor presentation and the omissions of material information made during that call and in the investor presentation and Defendants' continuing omission of that information even after they all concluded that the information was so definitively false that they should present it to Rural/Metro's bank lenders, (i) from May 2013 through August 2013, DW purchased approximately $11.2 million of Senior Notes, (ii) from May 2013 through July 2013 the Oaktree Plaintiffs purchased approximately $116 million of Senior Notes, and (iii) during July 2013 DG purchased approximately $9.3 million of Senior Notes.  If Plaintiffs had known the true facts, they would not have purchased the Senior Notes either at all or at the prices they paid and would not have incurred the resulting losses.

**D.   Disclosure of the Misstated Revenues and EBITDA**

264.   From May 20, 2013 through July 10, 2013, before learning the truth regarding Defendants and Rural/Metro's misrepresentations, before learning the information that had been misleadingly omitted by Defendants and Rural/Metro and before learning any other non-public information, the Oaktree Plaintiffs purchased more than $115 million in face value of Senior Notes as set forth on Exhibit A.

McKool Smith Hennigan, P.C.
Los Angeles, CA

THIRD AMENDED COMPLAINT

265.   Subsequently, on or around July 18, 2013, the Oaktree Plaintiffs signed a non-disclosure agreement that barred them from trading on information Rural/Metro would disclose to the Oaktree Plaintiffs (until that information would become public) and from publicly disclosing that information (again, until it was publicly disclosed). When Farber subsequently described pre-bankruptcy discussions with "certain" noteholders, he was not referencing DG or DW, which had not participated in those discussions.

266.   After signing the non-disclosure agreement, the Oaktree Plaintiffs did not engage in any further trading of Rural/Metro Senior Notes.  The Oaktree Plaintiffs held their position through the Rural/Metro bankruptcy.

267.   Pursuant to the non-disclosure agreement, in late July 2013 Warburg and Rural/Metro finally disclosed to the Oaktree Plaintiffs that the run-rate EBITDA number was, in fact, less than $60 million rather than the $70.1 million number (rising to $77.9 million on a pro forma basis) that had been reported at the May 2013 investor call.  The Oaktree Plaintiffs also learned that Rural/Metro was almost out of cash, a fact directly at odds with the May 2013 presentation.

268.   The Oaktree Plaintiffs could not make corrective disclosure by trading or otherwise and they did not do so.

269.   Until after the bankruptcy petition in August 2013, Warburg and Rural/Metro did not disclose Rural/Metro's true EBITDA numbers to DG and DW.

270.   Only after Rural/Metro filed for bankruptcy did the Plaintiffs learn that FTI's analysis had shown that Rural/Metro had $64 million in EBITDA through March 31, 2013, not the $70 million falsely represented by Defendants and Rural/Metro in May 2013.

271.   As acknowledged by Rural/Metro and Warburg, approximately $6 million of the reduction in the new EBITDA number for the twelve months ending March 31, 2013 (that was disclosed to the Oaktree Plaintiffs in late July 2013, and which was disclosed to the other Plaintiffs after the bankruptcy) corrected the failure

McKool Smith Hennigan, P.C.
Los Angeles, CA

of Warburg and FTI to take into account the full amount of accounts receivable reserves they knew should have been taken into account in calculating the March 31, 2013 EBITDA number previously provided to investors. This difference was critical and material. A reduction of $6 million in the EBITDA number would have demonstrated that Rural/Metro was unable to meet its cash obligations, and Plaintiffs would not have made their subsequent investments in the Senior Notes either at all or at the prices they paid. The presented EBITDA number was, in fact, overstated by at least $15 million, as Warburg, Carney and Rural/Metro finally acknowledged. If Warburg, Carney, DiMino and Rural/Metro had disclosed the truth and reduced the EBITDA number, Plaintiffs would not have purchased the Senior Notes either at all or at the prices they paid and would not have incurred the resulting losses.

## VIII. PRIMARY 10B VIOLATORS

### A. DiMino

272. DiMino is not a defendant in this action. He was, however, a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

273. Under Section 20(a) of the Exchange Act, Warburg and Carney were control persons of DiMino with respect to DiMino's primary violations.

274. DiMino's primary violations are set forth in detail above.

275. This Complaint details the manner in which DiMino committed the primary violations, and, establishes that he did so with the necessary mental state of intention to misstate, deliberate recklessness with respect to the truth or intention to omit. Certain central facts regarding DiMino's violations and mental state are set forth again here.

276. In May 2012, as a result of (i) internal Rural/Metro reports demonstrating a negative trend in the ratio of cash collections to recorded revenues, (ii) Rural/Metro's retention of E&Y to find out why this was occurring and to obtain more accurate and timely accounts receivable information, (iii) E&Y's confirmation that Rural/Metro was challenged with respect to revenue cycle data and information, (iv)

McKool Smith Hennigan, P.C.
Los Angeles, CA

E&Y's confirmation that Rural/Metro's system was "antiquated" and used "a risky methodology" that was "not appropriate for a company of the size and scale of Rural/Metro," and (v) E&Y's assessment that Rural/Metro lacked a database of information that would make it possible to value its receivables at month end or perform accurate profitability analyses, DiMino was consciously aware of Rural/Metro's flawed revenue recognition systems and inability to determine revenues accurately and reliably.

277. DiMino revealed none of this information in the May 15, 2012 noteholder call.

278. Instead DiMino presented Rural/Metro's (inflated and unreliable) revenue and EBITDA figures and stated that Rural/Metro's (not properly measured or reliably measurable) financial performance was "solid and trending in a positive direction."

279. Further, even though he knew that Rural/Metro's systems did not allow it to reliably determine if its revenues were growing or not and that cash collections were declining relative to recorded revenues, in May 2012, DiMino touted Rural/Metro as positioned for "continued" long-term growth.

280. Further, in May 2012, DiMino misleadingly focused attention on Rural/Metro's "continued growth in transport volumes" even though he knew and did not disclose that Rural/Metro could not reliably determine revenue from those transports.

281. In September 2012, as detailed above, DiMino remained consciously aware of Rural/Metro's flawed revenue recognition systems and inability to determine revenues accurately and reliably.

282. In September 2012, as a result of internal communications, communications with Warburg and communications with E&Y, DiMino was aware that a central flaw in Rural/Metro's revenue recognition and accounts receivable methodology was its unreliable use of a more than 1-year-old lookback methodology

McKool Smith Hennigan, P.C.
Los Angeles, CA

to determine what amount of revenues should be recorded for a particular transport or set of transports.

283. For the same reasons, DiMino was also aware that cash collections continued not to be recovered at levels matching Rural/Metro's previously recorded revenues, that Rural/Metro was not properly coding the severity level of many transports resulting in reduced receipts, and that its AS400 software system for billing and collecting was not appropriate for a company of Rural/Metro's size and complexity.

284. For the same reasons, DiMino was also aware that Rural/Metro had started raising its full commercial prices and was recording revenues that unreasonably assumed a 100% flow through of those rate increases notwithstanding applicable contract provisions that ensured a far smaller flow through.

285. For the same reasons, DiMino was also aware that Rural/Metro needed to record a reduction of $20 million in accounts receivables due to an initial review of the flaws in its methods for recording revenue. DiMino was similarly aware that Rural/Metro intended to record only a $17.6 million reduction and to "bleed" the remaining losses into future quarters even though the full $20 million was properly recordable immediately.

286. DiMino revealed none of this information in the September 2012 noteholder call.

287. Instead DiMino falsely stated that Rural/Metro needed only a $17.6 million write-down (not $20 million).

288. Further, DiMino stated that the $17.6 million write-down was a one-time item even though he knew that Rural/Metro's revenue recognition systems remained unreliable and that an already-recognized need for additional reserves and receivable write-downs meant that further write-downs were likely.

289.    Further, in September 2012, despite knowing that Rural/Metro had not yet improved its revenue recognition systems, DiMino touted Rural/Metro's "enhanced methodologies" for revenue recognition.

290.    Further, in September 2012, despite knowing that Rural/Metro's revenue recognition systems were unreliable and that the increases in contract prices were being unreasonably and improperly assumed to be flowing through to Rural/Metro's revenues, DiMino touted Rural/Metro's supposedly "significant increase in average patient charge" from "price increases."

291.    Further, despite his knowledge that the revenue recognition systems were unreliable and not yet enhanced, DiMino said in September 2012, "We have a high confidence in the reserve estimate for anticipated collections."

292.    Further, despite knowing that Rural/Metro's system still used an outdated "lookback" methodology that did not timely respond to or recognize changes in payer mix, DiMino said in the September 2012 call that Rural/Metro's systems were now "enhanced" so that it now had "the ability to work quickly enough through these payer mix shifts."

293.    Further, despite knowing that Rural/Metro did not have the ability to determine accurately and reliably the revenues from the acquisitions (PMT and Pacific Bowers), DiMino touted $92 million in revenue and $23 million in EBITDA from the acquisitions.  In reality, those acquisitions were not generating any EBITDA.

294.    For the September 2012 noteholder presentation, DiMino, together with Warburg and Carney, falsely prepared and distributed on behalf of Rural/Metro corresponding written materials that highlighted: (1) "financial results" with revenue EBITDA numbers that were not accurate or reliable; (2) "Increased Average Patient Charge" due to "improved revenue cycle management process," even though the processes were not improved and the price increases were being assumed to be effective despite contradictory contract terms; and (3) "High Confidence in Reserve Estimate" despite the fact that he knew the systems generating those reserve estimates

McKool Smith Hennigan, P.C.
Los Angeles, CA

79

2:15-cv-08574-PSG-MRWx

1   were unreliable and antiquated and that additional reserves were deemed necessary

2   but not yet recorded.

3        295.   In November 2012, as detailed above, DiMino remained consciously

4   aware of Rural/Metro's flawed revenue recognition systems and inability to determine

5   revenues accurately and reliably.

6        296.   In November 2012, as a result of internal communications,

7   communications with Warburg and communications with E&Y, DiMino remained

8   aware that a central flaw in Rural/Metro's revenue recognition and accounts

9   receivable methodology was its unreliable use of a more than 1-year-old lookback

10  methodology to determine what amount of revenues should be recorded for a

11  particular transport or set of transports.

12       297.   For the same reasons, DiMino was also aware that Rural/Metro was not

13  on track to perform in accordance with its financial plan.

14       298.   For the same reasons, DiMino was also aware that Rural/Metro had still

15  not fixed its flawed revenue recognition and accounts receivable systems.

16       299.   DiMino revealed none of this information in the November call with

17  noteholders.

18       300.   Instead, DiMino falsely stated: "We remain on track to perform the

19  [financial] plan for 2013," and he presented supposed financial results, including

20  revenues and EBITDA for the first quarter of fiscal year 2013.

21       301.   In February 2013, as detailed above, DiMino remained consciously

22  aware of Rural/Metro's flawed revenue recognition systems and inability to determine

23  revenues accurately and reliably.

24       302.   In February 2013, as a result of internal communications,

25  communications with Warburg and communications with E&Y, DiMino remained

26  aware that a central flaw in Rural/Metro's revenue recognition and accounts

27  receivable methodology was its unreliable use of a more than 1-year-old lookback

28

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

methodology to determine what amount of revenues should be recorded for a particular transport or set of transports.

303. For the same reasons, DiMino was also aware that Rural/Metro had still not fixed its flawed revenue recognition and accounts receivable systems. Indeed, Rural/Metro had just hired FTI to try to repair those systems and determine the actual extent of the necessary, but not yet recognized, revenue-reducing reserves--because E&Y would not take on that task.

304. For the same reasons, DiMino was also aware that collection rates at Pacific Bowers were far less than originally projected and that, as a result, further revenue-reducing reserves were already warranted but would instead belatedly be recognized later in the 2013 fiscal year to avoid covenant issues

305. DiMino revealed none of this information in the February 2013 call with noteholders. In particular, DiMino did not disclose Rural/Metro's most fundamental flaws: its inability to accurately measure revenue and EBITDA and its hidden need to recognize additional reserves.

306. Instead, on the February 2013 call, DiMino presented and discussed Rural/Metro's reported (but inflated and unreliable) revenues and EBITDA figures.

307. While DiMino discussed a $4.5 million write-down at Pacific Bowers, he misleadingly attributed it to various publicly-known trends rather than a systematic error in the collection rate used in recognizing revenue at Pacific Bowers relative to its actual history.

308. Similarly, DiMino misleadingly identified certain upside trends, including stronger transport volume and price increases despite knowing that Rural/Metro could not reliably determine revenues relating to transports and despite his knowledge that the price increases would not flow through at the rate used by Rural/Metro in concurrently reporting revenue.

McKool Smith Hennigan, P.C.
Los Angeles, CA

309.   DiMino also identified downward trends without identifying the many known problems with Rural/Metro's accounting systems, revenue recognition procedures and reserve levels.

310.   With regard to all of his omissions, DiMino (together with others at Rural/Metro and at Warburg) had exclusive knowledge of material facts that were not available to the Plaintiffs and he actively concealed the true facts by providing partial, misleading information about select financial information.

311.   With regard to all of his misstatements and omissions, DiMino acted pursuant to his agreement and conspiracy with Warburg and Carney to hide the truth for their mutual benefit, including his continuing in his position as CEO and Warburg's hiding its failure as an investor while delaying acknowledging Rural/Metro's financial condition with hopes of a miraculous turnaround that would save Warburg's equity investment.

**B.     Rural/Metro**

312.   Rural/Metro is not a defendant in this action.  It was, however, a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

313.   Under Section 20(a) of the Exchange Act, Warburg and Carney were control persons of Rural/Metro with respect to DiMino's primary violations.

314.   Rural/Metro's primary violations are set forth in detail above, including with respect to all the misconduct of DiMino and Perez, and with respect to all the misconduct alleged with respect to the May 2013 investor call and presentation and the failure to disclose (and correct) misleading statements made during the call.

315.   This Complaint details the manner in which Rural/Metro committed the primary violations, and, establishes that it did so with the necessary mental state of intention to misstate, deliberate recklessness with respect to the truth or intention to omit.  Certain central facts regarding Rural/Metro's violations and mental state are set forth again here.

McKool Smith Hennigan, P.C.
Los Angeles, CA

316.   All of DiMino's knowledge, misstatements and omissions described in this Complaint are attributable to Rural/Metro.  At all relevant times involving his knowledge and conduct, he was its Chief Executive Officer.

317.   Additionally, all of Perez's knowledge, misstatements and omissions described in this Complaint are attributable to Rural/Metro.  At all relevant times involving his knowledge and conduct, he was its Chief Financial Officer.

318.   Before the May 2012 investor call and written presentation, based on internal Rural/Metro reports, Perez was aware that Rural/Metro was collecting a smaller and smaller percentage of its recorded accounts receivables and revenues.  He knew that this strongly indicated that Rural/Metro's reported revenues and EBITDA were inflated and unreliable.

319.   At the same time, based on internal Rural/Metro reports and exchanges of information with Warburg and E&Y, Perez was aware that Rural/Metro's accounting system, particularly its revenue recognition system, was risky, inappropriate for a company the size and complexity of Rural/Metro, unreliable and unable to recognize recent changes in payer mix that could reduce the proper level of recordable revenues.

320.   In May 2012, Perez was also aware of all the facts known to DiMino that are described above.  As CEO and CFO, DiMino and Perez shared important financial information regarding Rural/Metro.

321.   In May 2012, Perez nonetheless orally presented to investors and caused Rural/Metro to deliver in writing to investors inflated and unreliable financials, including with respect to revenues and EBITDA.  He omitted the true facts of Rural/Metro's financial situation while presenting these figures.

322.   Before the September 2012 investor call and written presentation, Perez knew that Rural/Metro's financial situation necessitated a large increase in accounts receivable reserves attributable to revenues recorded in earlier periods.  Perez discussed with Warburg's Strauss just "how bad the situation was."  Perez was also

aware that Rural/Metro's flawed systems kept him from knowing the precise, proper adjustment.

323.   In September 2012, as Rural/Metro's CFO, Perez was also aware that Rural/Metro needed to record a reduction of $20 million in accounts receivables due to an initial review of the flaws in its methods for recording revenue.  Perez was similarly aware that Rural/Metro intended to record (and was recording) only a $17.6 million reduction and to "bleed" the remaining losses into future quarters even though the full $20 million was properly recordable immediately.

324.   In September 2012, Perez was also aware of all the facts known to DiMino that are described above.  As CEO and CFO, DiMino and Perez shared important financial information regarding Rural/Metro.

325.   In September 2012, Perez nonetheless orally presented to investors and caused Rural/Metro to deliver in writing to investors inflated and unreliable financials, including figures with respect to revenues and EBITDA that implemented only a $17.6 million adjustment rather than the necessary $20 million.  He omitted the true facts of Rural/Metro's financial situation while presenting these figures.

326.   At the time of the November 2012 investor call and written presentation, Perez remained aware that Rural/Metro still needed to record reserves on account of previously booked, inflated revenues.  He also knew that Rural/Metro's accounting system remained unreliable and in need of repair.

327.   In the November 2012 call, Perez continued to omit the true facts regarding Rural/Metro's financial situation and systems.  Instead, he presented orally and in writing unreliable revenue and EBITDA figures.

328.   He also sought to misleadingly assuage potential investor concern with the reliability of Rural/Metro's financial presentations by explaining that November's $2.2 million set of one-time cash items was unrelated to the kind of belated reserve adjustment taken in September, and was instead related primarily to the closure of an

McKool Smith Hennigan, P.C.
Los Angeles, CA

ambulette business, several small adjustments (each under $200,000) and a timing adjustment.

329.   In May 2013, on behalf of Rural/Metro, Carney, Strauss and Bingham prepared and jointly finalized written materials and made an oral presentation to investors that was knowingly misleading.  As detailed elsewhere in the Complaint, despite knowing that FTI had, in finalized schedules, measured Rural/Metro's EBITDA at $64 million for the twelve months ending March 31, 2013, Carney and Bingham orally presented that same EBITDA figure as $70 million.  Carney, Strauss and Bingham caused Rural/Metro to distribute written materials that also misrepresented Rural/Metro's EBITDA as $70 million.

330.   In finalized schedules prepared in April 2013, FTI and Bingham had determined that Rural/Metro's EBITDA was $64 million because Rural/Metro needed to allocate $27 million of its $52.8 million in reserve increases to the twelve months ending March 31, 2013.  In May 2013, however, Bingham orally presented to noteholders that FTI had determined that Rural/Metro needed to allocate only $20.4 million of the $52.8 million in recognized reserve increases to the twelve months ending March 31, 2013.

331.   In parallel fashion, Bingham (working with Strauss and Carney) jointly finalized page 6 of the written investor presentation for the May 15th call and caused it to reflect an allocation of $20.4 million ($4.4 million plus $35.2 million minus $16.2 million) rather than the correct $27 million.

332.   After presenting the false information, Rural/Metro (working with Warburg, Strauss, Carney, FTI, Bingham and A&M) confirmed that the misleading and false May 15, 2013 EBITDA presentation was even more wrong than the $6 million reduction required by FTI's methodology and Rural/Metro's available data before May 15, 2013.  Rural/Metro learned before June 27, 2013 that Rural/Metro's Last Twelve Month EBITDA ending in March 2013 was in the $55 million range or less.  By June 13, 2013, Rural/Metro recognized that even based on information

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

known by Rural/Metro, FTI and Warburg as of May 15, 2013, the Last Twelve Month EBITDA ending in March 2013 was overstated by more than $6 million. As Rural/Metro's Farber acknowledged, the proper analysis reflected $63 million to $64 million in place of the $70 million presented to actual and potential noteholders. Rural/Metro also concluded before June 27, 2013 that the EBITDA presented on May 15, 2013 should have been presented as $55 million for the twelve months ending March 31, 2013 based on historical information available as of March 31, 2013. By June 27, 2013, Rural/Metro also concluded that the $70 million EBITDA presentation was also misleading because then recent months, including March 2013, had EBITDA of less than $4 million. Rural/Metro decided to disclose this information to its bank lenders and did so on June 27, 2013. Nevertheless, Rural/Metro did not disclose and correct to actual and potential noteholders the May 15, 2013 misleading and false EBITDA statements, prior to Plaintiffs' purchases after June 27, 2013 and listed on Exhibit A.

### C. Carney

333. Carney was a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

334. Carney's primary violations are set forth in detail above.

335. This Complaint details the manner in which Carney committed the primary violations, and, establishes that he did so with the necessary mental state of intention to misstate, deliberate recklessness with respect to the truth or intention to omit. Certain central facts regarding Carney's violations and mental state are set forth again here.

336. In May 2012, as a result of (i) internal Rural/Metro reports demonstrating a negative trend in the ratio of cash collections to recorded revenues, (ii) Rural/Metro's retention of E&Y to find out why this was occurring and to obtain more accurate and timely accounts receivable information, (iii) E&Y's confirmation that Rural/Metro was challenged with respect to revenue cycle data and information, (iv)

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  E&Y's confirmation that Rural/Metro's system was "antiquated" and used "a risky

2  methodology" that was "not appropriate for a company of the size and scale of

3  Rural/Metro," and (v) E&Y's assessment that Rural/Metro lacked a database of

4  information that would make it possible to value its receivables at month end or

5  perform accurate profitability analyses, Carney was consciously aware of

6  Rural/Metro's flawed revenue recognition systems and inability to determine revenues

7  accurately and reliably.

8     337.   Carney was aware that none of this information was revealed in the May

9  15, 2012 noteholder call. Indeed, he directed that none of it should be revealed.

10     338.   Instead, at Carney's direction, DiMino presented Rural/Metro's (inflated

11  and unreliable) revenue and EBITDA figures and stated that Rural/Metro's (not

12  properly measured or reliably measurable) financial performance was "solid and

13  trending in a positive direction."

14     339.   Further, even though Carney knew that Rural/Metro's systems did not

15  allow it to reliably determine if its revenues were growing or not and that cash

16  collections were declining relative to recorded revenues, in May 2012, Carney caused

17  DiMino to tout Rural/Metro as positioned for "continued" long-term growth.

18     340.   Further, in May 2012, at Carney's direction, DiMino misleadingly

19  focused attention on Rural/Metro's "continued growth in transport volumes" even

20  though he knew and did not disclose that Rural/Metro could not reliably determine

21  revenue from those transports.

22     341.   In September 2012, as detailed above, Carney remained consciously

23  aware of Rural/Metro's flawed revenue recognition systems and inability to determine

24  revenues accurately and reliably.

25     342.   In September 2012, as a result of internal communications at Warburg,

26  communications with Rural/Metro and communications with E&Y, Carney was aware

27  that a central flaw in Rural/Metro's revenue recognition and accounts receivable

28  methodology was its unreliable use of a more than 1-year-old lookback methodology

McKool Smith Hennigan, P.C.
Los Angeles, CA

1  to determine what amount of revenues should be recorded for a particular transport or
2  set of transports.

3  343.   For the same reasons, Carney was also aware that cash collections
4  continued not to be recovered at levels matching Rural/Metro's previously recorded
5  revenues, that Rural/Metro was not properly coding the severity level of many
6  transports resulting in reduced receipts, and that its AS400 software system for billing
7  and collecting was not appropriate for a company of Rural/Metro's size and
8  complexity.

9  344.   For the same reasons, Carney was also aware that Rural/Metro had
10  started raising its full commercial prices and was recording revenues that
11  unreasonably assumed a 100% flow through of those rate increases notwithstanding
12  applicable contract provisions that ensured a far smaller flow through.

13  345.   For the same reasons, Carney was also aware that Rural/Metro needed to
14  record a reduction of $20 million in accounts receivables due to an initial review of
15  the flaws in its methods for recording revenue.  Carney was similarly aware that
16  Rural/Metro intended to record only a $17.6 million reduction and to "bleed" the
17  remaining losses into future quarters even though the full $20 million was properly
18  recordable immediately.  Bleeding financial results that are supposed to be recognized
19  in one quarter into a subsequent quarter is a fundamental fraud on investors.

20  346.   For the September 2012 noteholder presentation, Carney, together with
21  DiMino and others at Warburg, falsely prepared and distributed on behalf of
22  Rural/Metro corresponding written materials that highlighted: (1) "financial results"
23  with revenue EBITDA numbers that were not accurate or reliable (and that included
24  only a "one-time clean-up item" $17.6 million reserve adjustment when Carney was
25  aware that at least a $20 million adjustment was necessary and appropriate and that
26  with Rural/Metro's still unremedied accounting system the need for adjustments was
27  not a "one-time" matter); (2) "Increased Average Patient Charge" due to "improved
28  revenue cycle management process," even though the processes were not improved

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

THIRD AMENDED COMPLAINT

and the price increases were being assumed to be effective despite contradictory contract terms; and (3) "High Confidence in Reserve Estimate" despite the fact that he knew the systems generating those reserve estimates were unreliable and antiquated and that additional reserves were deemed necessary but not yet recorded. Through these written materials, Carney made direct misrepresentations in September 2012. Carney had ultimate control of the written presentation. He was the representative of the 100% owner of Rural/Metro, and Rural/Metro would not issue an investor presentation with content that he thought was inappropriate or that he thought should not be issued.

347.   Carney also attended the September 2012 noteholder call, but revealed none of the true facts in that call.

348.   Instead, when DiMino falsely stated that Rural/Metro needed only a $17.6 million write-down (not $20 million), Carney stayed silent. He knew that the information regarding the proper write-down based on existing facts was solely in the hands of Rural/Metro and Warburg (who had agreed not to reveal it) and was not available to investors, who would rely on the related misstatements.

349.   Further, Carney stayed silent when DiMino stated that the $17.6 million write-down was a one-time item even though Carney knew that Rural/Metro's revenue recognition systems remained unreliable and that an already-recognized need for additional reserves and receivable write-downs meant that further write-downs were likely. Again, Carney knew that the information regarding the systems and reserves was solely in the hands of Rural/Metro and Warburg and was not available to investors, who would rely on the related misstatements of Rural/Metro's financial situation.

350.   Further, in September 2012, despite knowing that Rural/Metro had not yet improved its revenue recognition systems, Carney stayed silent when DiMino touted Rural/Metro's "enhanced methodologies" for revenue recognition. Again, Carney knew that information regarding Rural/Metro's actual systems was solely in

2:15-cv-08574-PSG-MRWx

the hands of Rural/Metro, Warburg and E&Y, and was not available to investors who
would rely on the representation that Rural/Metro had enhanced methodologies.

351.   Further, in September 2012, despite knowing that Rural/Metro's revenue
recognition systems were unreliable and that the increases in contract prices were
being unreasonably and improperly assumed to be flowing through to Rural/Metro's
revenues, Carney stayed silent when DiMino touted Rural/Metro's supposedly
"significant increase in average patient charge" from "price increases."  Again, he
knew that the true information was not available to investors and that the partial
information being disclosed was misleading.

352.   Further, despite his knowledge that the revenue recognition systems were
unreliable and not yet enhanced, Carney stayed silent when DiMino said in September
2012, "We have a high confidence in the reserve estimate for anticipated collections."
Carney knew that investors could not access the true information and that the reserve
estimate was unreliable.

353.   Further, despite knowing that Rural/Metro's system still used an outdated
"lookback" methodology that did not timely respond to or recognize changes in payer
mix, DiMino said in the September 2012 call that Rural/Metro's systems were now
"enhanced" so that it now had "the ability to work quickly enough through these payer
mix shifts."  Carney again improperly stood silent.

354.   Further, despite knowing that Rural/Metro did not have the ability to
determine accurately and reliably the revenues from the acquisitions (PMT and Pacific
Bowers), DiMino touted $92 million in revenue and $23 million in EBITDA from the
acquisitions.  Carney knew that, in reality, Rural/Metro could not reliably determine if
those acquisitions were generating positive EBITDA.  Carney again stood silent.

355.   In September 2012, Carney also stayed silent rather than correcting the
misinformation he knew had been provided or revealing the true information he knew
had been omitted in the May 2012 investor call and presentation.

McKool Smith Hennigan, P.C.
Los Angeles, CA

356. As Bingham testified, in April 2013, FTI finalized the analysis of the allocation of the $52.8 million corrections from March 2013 and September 2012 at $27 million for the twelve months ending March 31, 2013, and Rural/Metro's resulting EBITDA at less than $64 million. As Bingham further testified, he so informed Warburg's Strauss. Strauss passed this crucial information along to his boss, Carney.

357. In May 2013, Carney stated on the investor call that Rural/Metro's EBITDA was $70 million and that FTI had made this determination, when he knew that Rural/Metro's EBITDA was no more than $64 million and that FTI had actually made that determination. Carney also controlled the written presentation that made the same misrepresentation.

358. Similarly, Carney stated on the investor call that Warburg would not need to provide Rural/Metro with additional equity because "[t]he company's in perfectly good liquidity position" when he knew that, with an EBITDA of no more than $64 million, Rural/Metro would likely face a near-term liquidity problem that would cause it to seek additional cash.

359. After presenting the false information, Carney confirmed that the $70 million EBITDA figure presented to the investors was even more wrong than the $6 million reduction required by FTI's methodology and Rural/Metro's available data before May 15, 2013. Carney confirmed by June 27, 2013 that Rural/Metro's Last Twelve Month EBITDA ending in March 2013 was in the $55 million range or less. Carney recognized that there was no way to dispute that even based on information known by Rural/Metro, FTI and Warburg as of May 15, 2013, the Last Twelve Month EBITDA ending in March 2013 was overstated to the investors by more than $6 million. This analysis reflected $63 million to $64 million in place of the $70 million presented to the investors. Based on work by Rural/Metro's management, Alvarez & Marsal, FTI and Warburg, Carney also concluded before June 27, 2013 that the EBITDA presented on May 15, 2013 should have been presented as $55 million for

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

2:15-cv-08574-PSG-MRWx

the twelve months ending March 31, 2013 based on historical information available as of March 31, 2013. By June 27, 2013, Carney also concluded that the $70 million EBITDA presentation was also misleading because then recent months, including March 2013, had EBITDA of less than $4 million. Carney decided to disclose this information to Rural/Metro's bank lenders and caused that to happen on June 27, 2013. Nevertheless, Carney did not disclose and correct to actual and potential noteholders the May 15, 2013 misleading and false EBITDA statements, prior to Plaintiffs' purchases after June 27, 2013 and listed on Exhibit A.

360. In the alternative, if any of the true information described above somehow did not become consciously resident in Carney's brain, he was deliberately reckless in making misrepresentations that were inconsistent with the true information he had been provided.

361. Throughout this complaint, where intentional misrepresentation is alleged, Plaintiffs allege in the alternative that defendants and primary violators were deliberately reckless in making their misstatements.

**D.  Warburg Pincus and Warburg Pincus Private Equity X, L.P.**

362. Warburg was a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5, based on the conduct of Carney and Strauss

363. Under Section 20(a) of the Exchange Act, Warburg was also a control person of DiMino, Rural/Metro, Carney and Strauss with respect to their primary violations.

364. Warburg's primary violations are set forth in detail above, including with respect to all of Carney's and Strauss's misconduct.

365. This Complaint details the manner in which Warburg (through Carney and Strauss) committed the primary violations, and, establishes that it did so with the necessary mental state of intention to misstate, deliberate recklessness with respect to the truth or intention to omit. Certain central facts regarding Warburg's violations and

McKool Smith Hennigan, P.C.
Los Angeles, CA

mental state are set forth again in the preceding section identifying central facts regarding Carney's violations and mental state.

366.   All of Carney's knowledge, misstatements and omissions described in this Complaint are attributable to Warburg.  At all relevant times involving his knowledge and conduct, he was employed by and acting on behalf of Warburg.

367.   All of Strauss's knowledge, misstatements and omissions described in this Complaint are attributable to Warburg.  At all relevant times involving his knowledge and conduct, he was employed by and acting on behalf of Warburg.

368.   Strauss, together with Bingham and Carney, prepared and finalized page 6 of the May 15, 2013 written presentation to noteholders.  This included finalizing the erroneous $20.4 million adjustment and $70 million EBITDA figures, notwithstanding express knowledge that Bingham had concluded (and had told Strauss) that the correct EBITDA figure was $64 million and express knowledge that FTI's finalized schedules from April 2013 identified $27 million in adjustments allocable to the twelve months ending March 31, 2013 and an EBITDA figure of $64 million.  Strauss falsely finalized page 6 despite his preparation of a draft of the schedule on that page that correctly reflected the required $27 million in adjustments and $64 million in EBITDA based on FTI's already finalized schedules.  Indeed, he prepared that draft page 6 based on FTI's April, finalized schedules before falsely revising the schedule to make it show the numbers set forth on page 6.

369.   After presenting the false information, the Warburg defendants confirmed that the misleading and false May 15, 2013 EBITDA presentation was even more wrong than the $6 million reduction required by FTI's methodology and Rural/Metro's available data before May 15, 2013.  The Warburg defendants learned by June 13, 2013 that Rural/Metro's Last Twelve Month EBITDA ending in March 2013 was in the $55 million range or less.  The Warburg defendants recognized that there was no way to dispute that even based on information known by Rural/Metro, FTI and Warburg as of May 15, 2013, the Last Twelve Month EBITDA ending in

McKool Smith Hennigan, P.C.
Los Angeles, CA

March 2013 was overstated to the investors by more than $6 million. As Rural/Metro's Farber acknowledged, the proper analysis reflected $63 million to $64 million in place of the $70 million presented to the investors. The Warburg defendants also concluded before June 27, 2013 that the EBITDA presented on May 15, 2013 should have been presented as $55 million for the twelve months ending March 31, 2013 based on historical information available as of March 31, 2013. By June 27, 2013, the Warburg defendants also concluded that the $70 million EBITDA presentation was also misleading because then recent months, including March 2013, had EBITDA of less than $4 million. The Warburg defendants decided to disclose this information to Rural/Metro's bank lenders and caused that to happen on June 27, 2013. Nevertheless, the Warburg defendants did not disclose and correct to actual and potential noteholders the May 15, 2013 misleading and false EBITDA statements, prior to Plaintiffs' purchases after June 27, 2013 and listed on Exhibit A.

**E. Bingham**

370. Bingham is not a defendant in this action. He was, however, a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

371. Under Section 20(a) of the Exchange Act, FTI was a control person of Bingham with respect to his primary violations.

372. Bingham's primary violations are set forth in detail above.

373. This Complaint details the manner in which Bingham committed the primary violations, and, establishes that he did so with the necessary mental state of intention to misstate, deliberate recklessness with respect to the truth or intention to omit. Certain central facts regarding Bingham's violations and mental state are set forth again here.

374. In May 2013, on behalf of Rural/Metro, Carney, Strauss and Bingham prepared and jointly finalized written materials and made an oral presentation to investors that was knowingly misleading. As detailed elsewhere in the Complaint, despite knowing that FTI had, in finalized schedules, measured Rural/Metro's

McKool Smith Hennigan, P.C.
Los Angeles, CA

EBITDA at $64 million for the twelve months ending March 31, 2013, Carney and Bingham orally presented that same EBITDA figure as $70 million. Carney, Strauss and Bingham caused Rural/Metro to distribute written materials that also misrepresented Rural/Metro's EBITDA as $70 million.

375. In finalized schedules prepared in April 2013, FTI and Bingham had determined that Rural/Metro's EBITDA was $64 million because Rural/Metro needed to allocate $27 million of its $52.8 million in reserve increases to the twelve months ending March 31, 2013. In May 2013, however, Bingham orally presented to noteholders that FTI had determined that Rural/Metro needed to allocate only $20.4 million of the $52.8 million in recognized reserve increases to the twelve months ending March 31, 2013.

376. In parallel fashion, Bingham (working with Strauss and Carney) jointly finalized page 6 of the written investor presentation for the May 15th call and caused it to reflect an allocation of $20.4 million ($4.4 million plus $35.2 million minus $16.2 million) rather than the correct $27 million.

377. In May 2013, when Carney stated that FTI had calculated that Rural/Metro's EBITDA was $70 million, Bingham did not correct him.

378. In a series of steps detailed elsewhere in this complaint and in the attached transcript, Bingham correctly started with the $90.6 million in EBITDA that Rural/Metro's flawed systems indicated. But Bingham then orally (and in the written presentation )walked through the steps that showed a $20.4 million adjustment and a $70.1 million EBITDA figure, rather than truthfully identifying the FTI-finalized $27 million adjustment and $64 million EBITDA figure.

379. Specifically, referencing the $4.4 million figure on page 6, Bingham stated:

> The first piece that we abstracted from there [i.e., deducted from the $90.6 million systems-generated EBITDA], as you're aware, the company posted a $17.6 million

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

adjustment last June. All this [$4.4 million figure] does within that is quantify that [allocable portion] within the piece that related to the fourth quarter of fiscal '12 – and that's the only quarter of '12 that's still in our trailing 12 months.

380. Regarding the allocation of the $35.2 million reduction, Bingham explained, on page 6 and in the oral presentation of page 6, that the portion allocable to the twelve months ending March 31, 2013 could be calculated by taking the total $35.2 million reduction (which covered multiple years) and reducing it by the portion of that reduction that was allocable to periods ending March 31, 2012 or earlier. This latter figure he stated was $19.2 million. Accordingly, the portion of the $35.2 million allocable to the last twelve months was $16 million ($35.2 million less $19.2 million).

381. Specifically, Bingham stated: "AR was overstated by approximately $35 million" and that, "[b]ased on our analysis and look back, we were able to determine that $19.2 million of that [additional $35.2 million reserve] in fact related to periods prior to 12 months ended 03/31, which gets you to the run rate of approximately $70.1 million."

382. Having misrepresented that the allocation of the $52.8 million in corrections was $20.4 million ($4.4 million plus $35.2 million less $19.2 million) when it actually had been finalized at $27 million, Bingham also misrepresented the run rate of approximately $70 million that FTI's completed math indicated was approximately $64 million.

383. This oral presentation of an historical $70.1 million EBITDA was repeated in writing in the presentation prepared, and provided to investors, by Bingham, FTI, Strauss, Warburg and Rural/Metro. This written presentation was knowingly false and misleading.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

384.   Even though FTI's completed, detailed analysis indicated an EBITDA of approximately $64 million, Bingham orally presented page 6 of Exhibit B, as finalized by Strauss and Bingham, on the May call.

385.   Bingham testified in a deposition that prior to the May 15, 2013 investor call, he told Warburg's Strauss that the correct EBITDA number would be in the range of $64 million, based on work FTI had finalized in April 2013.

> Q:      We were discussing the EBITDA calculation that you did, and I think you said that your EBITDA calculation that you provided was approximately $64 million.  Do you recall that?
>
> Bingham:    As it relates to March [2013].
>
> Q:      As it relates to March.  And did you provide that number and backup to Warburg and to Rural/Metro management?
>
> Bingham:    It was a response to Jacob [Strauss at Warburg]. I do not recall if Rural/Metro management was copied on that.
>
> Q:      Okay.  So, you provided that to Mr. Jacob Strauss at Warburg?
>
> Bingham:    Yes.
>
> Q:      And was that prior to giving the 3/31/13 presentation in May?
>
> Bingham:    Correct.

386.   After presenting the false information, Bingham confirmed that the $70 million EBITDA figure presented to the investors was even more wrong than the $6 million reduction required by FTI's methodology and Rural/Metro's available data before May 15, 2013.  Bingham confirmed by June 27, 2013 that Rural/Metro's Last Twelve Month EBITDA ending in March 2013 was in the $55 million range or less.

Bingham recognized that there was no way to dispute that even based on information known by Rural/Metro, FTI and Warburg as of May 15, 2013, the Last Twelve Month EBITDA ending in March 2013 was overstated to the investors by more than $6 million. This analysis reflected $63 million to $64 million in place of the $70 million presented to the investors. Based on work by Rural/Metro's management, Alvarez & Marsal, FTI and Warburg, Bingham also concluded before June 27, 2013 that the EBITDA presented on May 15, 2013 should have been presented as $55 million for the twelve months ending March 31, 2013 based on historical information available as of March 31, 2013. By June 27, 2013, Bingham also concluded that the $70 million EBITDA presentation was also misleading because then recent months, including March 2013, had EBITDA of less than $4 million. Rural/Metro decided to disclose this information to its bank lenders and did so on June 27, 2013. Nevertheless, Bingham did not disclose and correct to actual and potential noteholders the May 15, 2013 misleading and false EBITDA statements, prior to Plaintiffs' purchases after June 27, 2013 and listed on Exhibit A.

387.    When asked about the Rural/Metro presentation in June 2013 that identified to lenders that the $70 million EBITDA figure should have been $64 million, Bingham testified in December 2013 that FTI provided its work related to revenue recognition and the resulting numbers regarding allocation of the $52.8 million in earnings reductions. He testified that "those numbers have not changed. Eight months later they have not changed." Eight months before December 2013 was April 2013, when FTI completed the work allocating the $52.8 million.

388.    Bingham could have provided an errata to his deposition if he misspoke or if he contended that he was mis-transcribed, but he never did so.

### F.    FTI

389.    FTI was a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5, based on Bingham's conduct.

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

390.   Under Section 20(a) of the Exchange Act, FTI was also a control person of Bingham with respect to his primary violations.

391.   FTI's primary violations are set forth in detail above, including with respect to all of Bingham's misconduct.

392.   This Complaint details the manner in which FTI (through Bingham) committed the primary violations, and, establishes that it did so with the necessary mental state of intention to misstate, deliberate recklessness with respect to the truth or intention to omit.   Certain central facts regarding FTI's violations and mental state are set forth again in the preceding section identifying certain central facts regarding Bingham's violations and mental state.

393.   All of Bingham's knowledge, misstatements and omissions described in this Complaint are attributable to FTI.   At all relevant times involving his knowledge and conduct, he was employed by and acting on behalf of FTI.

## IX.   PLAINTIFFS' INJURY

394.   Warburg, Carney, Rural/Metro, DiMino, Perez, FTI and Bingham misrepresented revenue and EBITDA on Rural/Metro investor calls and in investor presentations by failing to disclose their knowledge that Rural/Metro's reported revenues were inflated, unreliable and inaccurate as a result Rural/Metro's antiquated, defective and unreliable revenue recognition systems.   Warburg, Carney, Rural/Metro and DiMino also misrepresented on investor calls and investor presentations that Rural/Metro's revenue recognition and collection processes were fixed when they knew they were not.

395.   As identified above, Plaintiffs attended Rural/Metro's investor calls and reviewed investor presentations preceding each Plaintiff's purchases.   Following investor calls, Plaintiffs received and reviewed transcripts of the investor calls.   As Warburg, Carney, Rural/Metro, DiMino, Perez, FTI and Bingham knew, investors and potential investors in Senior Notes would rely on the investor calls and investor presentations in making their Rural/Metro investment decisions.   Plaintiffs did in fact

1    rely on the investor calls and investor presentations in making their decisions to

2    purchase and hold the Senior Notes.  Exhibit A reflects the timing of each Plaintiff's

3    Senior Notes purchases.

4        396.  During the May 15, 2013 investor call, Warburg, Carney, Rural/Metro,

5    FTI and Bingham revealed that Rural/Metro's revenues and EBITDA had been

6    substantially overstated for a period of years ending March 31, 2013 and that an

7    additional $35.2 million write-down was needed to account for previously-

8    misrepresented failures in its revenue recognition system.  These revelations (and their

9    retroactive allocation to previously reported periods) confirmed that, based on data

10   existing at the time of the prior quarterly calls and presentations, revenues and

11   EBITDA should have been reported at materially lower levels and that the ongoing

12   inadequacy of the revenue recognition and other accounting systems should have been

13   disclosed.  Following this revelation, Rural/Metro's Senior Notes dropped from

14   trading in excess of par to prices in the 80s.  The drop in the Senior Notes' value

15   caused losses for the Plaintiffs that had purchased before that call.

16       397.  The drop in the Senior Notes' value following the May 15, 2013 investor

17   call did not fully reflect the inflation in price caused by Rural/Metro's prior

18   misrepresentations and omissions because the information provided by Warburg,

19   Carney, Strauss, Rural/Metro, Bingham and FTI in connection with and during the

20   May 15, 2013 investor call contained additional misrepresentations and omissions,

21   primarily an inflated LTM EBITDA metric and an inaccurate assessment of

22   Rural/Metro's capital adequacy.  Specifically, Warburg, Carney, Strauss, Rural/Metro,

23   Bingham and FTI asserted in the investor presentation that Rural/Metro's LTM

24   EBITDA was at least $70 million—the bare minimum that Rural/Metro required in

25   order to meet its annual cash requirements—when they knew that Rural/Metro's

26   EBITDA was at most $64 million.

27       398.  By July 9, 2013, information began to circulate among investors that

28   Rural/Metro's liquidity position was worse than it had publicly portrayed due to an

THIRD AMENDED COMPLAINT

1    issue with its receivables.  The worsening liquidity was a natural consequence of

2    Rural/Metro's lower-than-reported revenue, earnings and EBITDA.  This information

3    caused the Senior Notes' pricing to drop from the high 70's to mid 80's to the mid

4    60's to low 70's.  This caused losses for all the Plaintiffs who had purchased by that

5    time.

6        399.   More direct evidence that there may have been misrepresentations and

7    omissions in the May 15, 2013 information was revealed to the public on July 15,

8    2013, when Rural/Metro missed an interest payment.  If Rural/Metro's run-rate

9    EBITDA had been more than $70 million—as represented by the company—

10   Rural/Metro would likely have had sufficient cash to meet its interest obligations.

11   This missed interest payment—and its indication that Rural/Metro's EBITDA may

12   have been misrepresented–resulted in a drop in the Senior Notes' trading price to the

13   low 60's and high 50's.  This caused losses for all the Plaintiffs who had purchased by

14   that time.

15       400.   The missed interest payment did not definitively establish that

16   Rural/Metro's run-rate EBITDA had been less than $70 million as of March 31, 2013.

17   The missed interest payment also did not definitively establish that Rural/Metro's run-

18   rate EBITDA was $64 million or less as of March 31, 2013.  Cash flow is not always

19   perfectly tied to EBITDA, so it was possible that the cash flow shortfall was a blip,

20   but the lack of cash to make the interest payment did shake the market.  The missed

21   interest payment also did not disclose that Warburg, FTI and Rural/Metro had known

22   that EBITDA was $64 million or less as of March 31, 2013.

23       401.   On August 4, 2013, Rural/Metro's new CFO Farber filed a declaration in

24   connection with Rural/Metro's bankruptcy filing made the same day.  Farber's

25   declaration publicly revealed that Rural/Metro's annual cash EBITDA was between

26   $50 million and $60 million—not the $70 million that Rural/Metro had represented to

27   investors.  Farber's declaration's reference to an EBITDA of $50 million to $60

28   million directly referred to or indirectly illuminated the EBITDA for the twelve-

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

THIRD AMENDED COMPLAINT

months ending March 31, 2013. His analysis of EBITDA was consistent with the $55 million calculation for the period ending March 31, 2013 in Rural/Metro's June presentation to lenders, which included the Alvarez & Marsal adjustments referenced by Farber and the negative $6 million "roll forward" that was falsely not taken into account in the May presentation to actual and potential noteholders. An EBITDA of $50 million to $60 million indicated that Rural/Metro had a negative cash-flow. Following Farber's statement, the market understood the unreliable nature of the previous representation of a run-rate twelve-month EBITDA of $70 million through March 31, 2013.

402. Following the implicit disclosures by the bankruptcy filing and the explicit and implicit disclosures in the Farber declaration, the Senior Notes dropped from prices in the 50's to prices in the mid to high 20's. This caused losses for all the Plaintiffs who had purchased by that time.

403. As a direct and proximate result of Defendants' material misrepresentations and omissions alleged above, the Plaintiffs purchased their Senior Notes at prices that were far in excess of what the Senior Notes were actually worth. Underlying and connected with all of Rural/Metro's financial issues were its dramatically over-reported revenues, its inability to accurately book its revenues and determine its profitability and true cash flow, and its concomitant failure to properly manage its operations and finances, the depths of which problems Defendants misrepresented and concealed from existing and potential investors in the Senior Notes. The truth concerning Rural/Metro's financial issues was not fully revealed until after Rural/Metro's bankruptcy, resulting in a significant drop in the price of the Senior Notes. If Plaintiffs had known the true facts, they would not have purchased the Senior Notes either at all or at the prices they paid and would not have incurred those losses.

404. As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged above, Plaintiffs and each of

1  them have been damaged through their purchases of the Senior Notes at inflated prices

2  higher than the value of the Senior Notes if the Plaintiffs and the market had received

3  full, truthful information.  Further, Plaintiffs ultimately recovered far less than they

4  had paid for the Senior Notes that they purchased at inflated prices.  The purchases

5  and damages were a direct result of the Defendants' misrepresentations, omissions and

6  wrongful conduct described above, and the damages would not otherwise have been

7  incurred.

8      405.    Pursuant to written agreements between the parties, all statutes of

9  limitations and similar rules regarding timely filing of a complaint were tolled from

10  September 24, 2014 through August 31, 2015 with respect to Plaintiffs' claims against

11  Warburg and Carney.

12      406.    Pursuant to written agreement between the parties, all statutes of

13  limitations and similar rules regarding timely filing of a complaint were tolled from

14  March 3, 2015 through August 31, 2015 with respect to Plaintiffs' claims against FTI.

15      407.    On August 19, 2015, Plaintiffs commenced an action against Defendants

16  in California state court for intentional and negligent misrepresentation, concealment

17  and fraud based on conspiracy.  Plaintiffs alleged materially the same facts in the

18  California action as are alleged here, and Defendants were on notice of the bases for

19  Plaintiffs' claims at least since commencement of the California proceeding.

20  Following receipt of Plaintiffs' California complaint, Defendants stated that they

21  intended to challenge personal jurisdiction in California state court.  On November 4,

22  2015, Plaintiffs commenced this action and thereafter dismissed the state action.

23

24

25

26

27

28

McKool Smith Hennigan, P.C.
Los Angeles, CA

THIRD AMENDED COMPLAINT

## X.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of Section 20(a) of the Exchange Act by All Plaintiffs against Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., and Sean Carney)**

408.   Plaintiffs repeat and reallege each and every allegation set forth earlier in this Complaint as if again fully set forth here.

409.   Primary violations of Rule 10b-5 and other securities laws are alleged above.  The primary violators include Rural/Metro (through DiMino, Perez and, at least with respect to the March 2013 misrepresentations, other individuals), DiMino, and Carney.

410.   Warburg acted as a control person of Rural/Metro, DiMino and Carney within the meaning of Section 20(a) of the Exchange Act.

411.   Carney acted as a control persons of Rural/Metro and DiMino within the meaning of Section 20(a) of the Exchange Act.

412.   By virtue of their high-level positions, their ownership and contractual rights, participation in and awareness of Rural/Metro's operations and intimate knowledge of aspects of Rural/Metro's financial issues and dissemination of information to existing and potential investors in Senior Notes, Warburg and Carney had the power to influence and control and did influence and control, directly or indirectly, the decision making of Rural/Metro and DiMino himself, including the content and dissemination of the various statements and omissions in the investor presentations and otherwise which Plaintiffs contend are false and misleading as well as their failure to disclose and correct the misleading statements made in May 2013 and earlier.

413.   Warburg and Carney had direct and supervisory involvement in the day-to-day operations of Rural/Metro and DiMino and, therefore, had the power to control or influence the content and dissemination of the various statements and omissions in

the investor presentations or otherwise and the correction (or lack thereof) of misleading statements made in May 2013 and earlier which give rise to the securities violations alleged in this Complaint, and Warburg and Carney exercised this power.

414. Additionally, (a) Warburg exercised actual power and control over Rural/Metro and DiMino through Warburg's ultimate ownership and control of 100% of the common stock of Rural/Metro; (b) Carney was Chairman of the Board of Directors of Rural/Metro and was primarily responsible for Warburg's investment in Rural/Metro, including the monitoring and oversight of such investment, and by virtue of his responsibilities Carney was privy to and participated in the creation, development and reporting of Rural/Metro's financial condition during the investor presentations; (c) Carney and Warburg enjoyed significant personal contact and familiarity with other members of the Rural/Metro management team, internal reports and other data and information about Rural/Metro's finances, operations and antiquated and deficient revenue recognition system, (d) Carney and Warburg were fully engaged in and directed the failed efforts to quantify Rural/Metro's revenue recognition issues, and the retention and communication with the experts with whom Warburg had preexisting relationships, including Ernst & Young and FTI, that were hired to assist Rural/Metro and Warburg in resolving its financial issues; (e) Warburg and Carney were provided with or had unlimited access to copies of the investor scripts and investor presentations for the investor calls and to the information and materials relating to the Senior Notes; (f) Warburg and Carney exercised ultimate authority over the statements made during the quarterly investor calls and financial presentations, and had the ability to prevent the issuance of the statements in the investor presentations or cause the statements to be corrected; and (g) Carney and Warburg made the decision to terminate and did terminate DiMino.

415. By virtue of its employment of Carney and its paying of his salary and other income, Warburg had the power to influence and control and did influence and control, directly or indirectly, Carney's decision making, including the content and

dissemination of the various statements and omissions in the investor presentations and otherwise which Plaintiffs contend are false and misleading and the failure to disclose and correct such misleading statements.

416.   Warburg had direct and supervisory involvement in Carney's statements and other actions and inactions.  Warburg therefore had the power to control or influence the content and dissemination of the various statements and omissions in the investor presentations or otherwise and the failure to disclose and correct misleading statements which give rise to Carney's securities violations alleged in this Complaint. Warburg exercised this power.

417.   By virtue of their positions as controlling persons, Warburg and Carney are also liable pursuant to Section 20(a) of the Exchange Act for the primary violators and violations set forth above.  As a direct and proximate result of each such controlling person's wrongful conduct, Plaintiffs suffered substantial damages in connection with their purchases of the Senior Notes.

## SECOND CLAIM FOR RELIEF

## (Violations of Section 10(b) of The Exchange Act and SEC Rule 10b-5 by All Plaintiffs Against All Defendants)

418.   Plaintiffs repeat and reallege each and every allegation set forth earlier in this Complaint as if again fully set forth here.

419.   The Senior Notes were securities within the meaning of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

420.   Through the acts of misrepresentation, omission and concealment alleged herein the Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and did (i) deceive existing and potential investors in the Senior Notes, including Plaintiffs, as alleged herein; and (ii) cause investors, including Plaintiffs, ignorant of the true facts to purchase Senior Notes when, if the true facts were known, they would not have purchased the Senior Notes either at all or at the

prices they paid.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions alleged in this Complaint.

421.   Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and financial condition of Rural/Metro as specified in this Complaint.

422.   Defendants, while in possession of material adverse non-public information and in order to assure existing and potential investors in Senior Notes of Rural/Metro's value and performance (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, including by failing to disclose and correct false statements; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers, including Plaintiffs, of Senior Notes, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

423.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberately reckless disregard for the truth in that they deliberately failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing material facts concerning Rural/Metro's business, operations and financial condition, including its dramatically over-reported revenues, its inability to accurately book its revenues and determine its profitability and true cash flow, and its concomitant failure to properly manage its operations and finances from existing and prospective investors in order to continue the operations of Rural/Metro for as long as possible to buy time to salvage Warburg's investment in Rural/Metro and Warburg's reputation as an expert healthcare investor.  In its investor

McKool Smith Hennigan, P.C.
Los Angeles, CA

presentations, Warburg routinely touted its deep and allegedly profitable healthcare experience and, as a result, was motivated to delay public disclosure of its failing efforts and financial losses in Rural/Metro to avoid the taint such disclosure would have on its healthcare investment opportunities.

424. Plaintiffs directly relied on the misrepresentations and deceptive and misleading statements set forth in this Complaint, and were deceived by the omission of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in the investor presentations or otherwise. In evaluating their decision to purchase Senior Notes, Plaintiffs pursued their own interests with care and good faith and were ignorant of the misrepresentations and omissions alleged in this Complaint or of the risks created by those misrepresentations and omissions. Those misrepresentations and omissions concerned matters as to which Plaintiffs could not, in the exercise of due diligence, have learned the true and accurate facts.

425. With respect to Plaintiffs' claims arising under Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants' fraudulent omissions of material facts that were necessary to be disclosed in order for the investor presentations not to be materially deceptive and misleading, give rise to a presumption that Plaintiffs' relied on the accuracy and completeness of the disclosures made in the investor presentations and relied on the belief that Defendants had discharged their duty to disclose material facts.

426. Moreover, the material misstatements and omissions made by Defendants deceived the Plaintiffs who purchased the Senior Notes and created, maintained and artificially inflated the market for the Senior Notes. It was reasonably foreseeable to Defendants that the misstatements and omissions made in connection with the investor presentations or otherwise would be used in connection with the purchase or sale of the Senior Notes and would be relied upon by purchasers in making their investment decisions to purchase the Senior Notes. Had Defendants disclosed the truth about the matters alleged in this Complaint to have been material misrepresentations or

omissions, the Senior Notes would have been unmarketable or commanded a price far less than that at which they were purchased by Plaintiffs. As a result, all Defendants are jointly and severally liable under Section 10(b) and Rule 10b-5 to purchasers of the Senior Notes.

427. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

428. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered substantial damages in connection with their purchases of the Senior Notes.

### THIRD CLAIM FOR RELIEF

### (Violation of Section 20(a) of the Exchange Act by All Plaintiffs against FTI)

429. Plaintiffs repeat and reallege each and every allegation set forth earlier in this Complaint as if again fully set forth here.

430. Primary violations of Rule 10b-5 and other securities laws are alleged above. The primary violators include Bingham.

431. FTI acted as a control person of Bingham within the meaning of Section 20(a) of the Exchange Act.

432. By virtue of its employment of Bingham and its paying of his salary and other income, FTI had the power to influence and control and did influence and control, directly or indirectly, Bingham's decision making, including the content and dissemination of the various statements and omissions in the investor presentations and otherwise which Plaintiffs contend are false and misleading as well as his failure to disclose and correct such misleading statements.

433. FTI had direct and supervisory involvement in Bingham's statements and other actions and inactions. FTI therefore had the power to control or influence the content and dissemination of the various statements and omissions in the investor presentations or otherwise and the disclosure and correction (or lack thereof) of such

McKool Smith Hennigan, P.C.
Los Angeles, CA

McKool Smith Hennigan, P.C.
Los Angeles, CA

misleading statements which give rise to Bingham's securities violations alleged in this Complaint. FTI exercised this power.

434. By virtue of its positions as a controlling person, FTI is also liable pursuant to Section 20(a) of the Exchange Act for Bingham's violations set forth above. As a direct and proximate result of FTI's wrongful conduct, Plaintiffs suffered substantial damages in connection with their purchases of the Senior Notes.

## FOURTH CLAIM FOR RELIEF

### (For Intentional Misrepresentation by All Plaintiffs against All Defendants)

435. Plaintiffs repeat and reallege each and every allegation alleged earlier in this Complaint as if fully set forth again here.

436. Each Defendant knowingly made material false representations to Plaintiffs.

437. Each Defendant made the material misrepresentations, as set forth above, knowing that such representations were false at the time they were made. Alternatively, Defendants made these misrepresentations recklessly and without regard for their truth.

438. Defendants made these misrepresentations with the intent that Plaintiffs rely on them to consummate the purchase of the Senior Notes.

439. Plaintiffs were unaware of the falsity of Defendants' misrepresentations and could not discover the true information with the exercise of reasonable diligence.

440. Plaintiffs actually and justifiably relied on the material misrepresentations, believing the representations to be true. In reliance upon Defendants' misrepresentations, Plaintiffs purchased the Senior Notes. Plaintiffs would not have purchased the Senior Notes if they had known of the falsity of Defendants' representations.

441. Defendants' fraudulent conduct was a substantial factor in Plaintiffs' losses. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs

1   have suffered substantial monetary losses, including without limitation monetary

2   losses resulting from the overpayment for the Senior Notes and the loss of profits and

3   fees, for which they are entitled to recover damages from Defendants in an amount to

4   be determined according to proof at trial. Plaintiffs are also entitled to prejudgment

5   interest on their losses, and all other relief that law or equity provide.

6       442.   In making the intentional misrepresentations described in this Complaint,

7   Defendants, and each of them, acted fraudulently with the intention of depriving

8   investors of their property, intended to cause injury to the Plaintiffs and acted

9   despicably with a willful and conscious disregard of the rights of others. Plaintiffs are

10  therefore entitled to punitive damages in an amount to be determined at trial, which

11  are appropriate to punish or set an example of the Defendants, and each of them.

**FIFTH CLAIM FOR RELIEF**

**(For Concealment by All Plaintiffs against All Defendants)**

14      443.   Plaintiffs repeat and reallege each and every allegation alleged earlier in

15  this Complaint as if fully set forth again here.

16      444.   Each Defendant knowingly suppressed and concealed material facts from

17  Plaintiffs and omitted to state numerous material facts necessary in order to make the

18  statements made, in the light of the circumstances under which they were made, not

19  misleading.

20      445.   By virtue of their relationship to Plaintiffs and with each other, and as a

21  result of their awareness that they had made false statements of historical fact on May

22  15, 2013, Defendants had a duty to disclose the concealed and omitted facts to

23  Plaintiffs. Among other things, Defendants disclosed some facts to Plaintiffs but

24  intentionally failed to disclose other important facts, making the disclosure deceptive.

25  Additionally, Defendants made public statements to investors and the securities laws

26  require that such statements not omit material facts.

27      446.   Defendants intentionally failed to disclose important facts that were

28  known only to them and that Plaintiffs could not have discovered.

McKool Smith Hennigan, P.C.
Los Angeles, CA

111

447. Defendants actively concealed important facts from Plaintiffs and prevented them from discovering those facts.

448. Plaintiffs were unaware of the truth of the omitted and concealed facts and could not discover the true information with the exercise of reasonable diligence.

449. Defendants intended to deceive Plaintiffs through their omission and concealment. Defendants omitted and concealed material facts with the intent to defraud Plaintiffs by inducing them to consummate the purchase of the Senior Notes.

450. Plaintiffs actually and justifiably relied on the omissions and concealment of Defendants, not knowing the omitted and concealed facts. In reliance upon Defendants' omissions, Plaintiffs purchased the Senior Notes. Plaintiffs would not have purchased the Senior Notes either at all or at the prices they paid and would not have incurred the resulting losses.

451. Defendants' fraudulent conduct was a substantial factor in Plaintiffs' losses. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have suffered substantial monetary losses, including without limitation monetary losses resulting from the overpayment for the Senior Notes and the loss of profits and fees, for which they are entitled to recover damages from Defendants in an amount to be determined according to proof at trial. Plaintiffs are also entitled to prejudgment interest on their losses, and all other relief that law or equity provide.

452. In carrying out the intentional concealment described in this Complaint, Defendants, and each of them, acted fraudulently with the intention of depriving investors of their property, intended to cause injury to the Plaintiffs and acted despicably with a willful and conscious disregard of the rights of others. Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial, which are appropriate to punish or set an example of the Defendants, and each of them.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

**SIXTH CLAIM FOR RELIEF**

**(For Fraud Based on Conspiracy by All Plaintiffs against Defendants Warburg Pincus LLC, Warburg Pincus Private Equity X, L.P., Carney and FTI)**

453.   Plaintiffs repeat and reallege each and every allegation alleged earlier in this Complaint as if fully set forth again here.

454.   Commencing no later than the May 2012 investor call, Warburg, Carney and DiMino knowingly and willfully conspired and agreed among themselves to perpetrate a fraud on current and prospective investors in the Senior Notes, including Plaintiffs.  In some instances, including with respect to "bleeding" and implementing already-required reserves in later time periods and misrepresenting supposed improvements and repairs to Rural/Metro's financial systems, the agreement was express with the parties actually discussing their intent to misrepresent the facts and omit the truth.  At a minimum, in all instances, this conspiracy and agreement was tacit, with each party doing their part to further their known shared goals of providing misleading financial information and misrepresenting and hiding the actual state of Rural/Metro's financial systems.

455.   This conspiracy and agreement had multiple elements:  (1) to misrepresent Rural/Metro's existing financial condition, particularly its recordable revenues and EBITDA, and (2) to misrepresent and conceal the inability of Rural/Metro to account for its revenues in an accurate and reliable manner. Intentionally and pursuant to the common plan and design, they misrepresented the adequacy of Rural/Metro's revenue recognition system, mischaracterized the $17.6 million write-off as a one-time event, dramatically over-reported revenues and cash flow, and expressed confidence in Rural/Metro's financial systems when they knew that major, existing problems with Rural/Metro's revenue recognition system had not been resolved, and that, in future quarters, Rural/Metro would need to increase the reserves used to calculate revenue because past events already dictated those reserves be increased for completed quarters but Rural/Metro was instead padding

1   income and EBITDA in the completed quarters by deciding to defer the

2   implementation of the already-justified reserves.

3   456.   In furtherance of such conspiracy, Warburg, Carney and DiMino each

4   reviewed and approved the script and investor presentation for the September 2012

5   investor call which they knew included the foregoing misrepresentations and

6   omissions, and which would be relied upon by current and prospective investors in the

7   Senior Notes.

8   457.   Warburg, Carney and DiMino demonstrated their agreement to perpetrate

9   a fraud by virtue of the fact that they knew the representations made by them during

10  the September 2012 investor call were false and did not disclose what they learned

11  from E&Y shortly before the call—that the revenue recognition system was

12  antiquated and unreliable.

13  458.   Pursuant to, and in furtherance of, such conspiracy Warburg, Carney and

14  DiMino, continued to knowingly misrepresent the adequacy of Rural/Metro's revenue

15  recognition system in the November 2012 and February 2013 investor calls.  The

16  script and the financial presentation for each of such calls were reviewed by Warburg,

17  Carney and DiMino, each of whom failed to disclose to current and prospective

18  investors in the Senior Notes that the issues with Rural/Metro's revenue recognition

19  system had not been remedied.  Additionally, Warburg, Carney, DiMino and Perez

20  knew that additional substantial write-offs were needed but were not being recorded

21  when recognized.

22  459.   Prior to the May 15, 2013 investor call, DiMino left Rural/Metro's

23  employ and stopped participating in the conspiracy.  FTI and Bingham joined the

24  conspiracy by express and implied agreement before the May 14th and 15th calls and

25  the May 15th written presentation.

26  460.   In furtherance of the conspiracy, Warburg (through both Strauss and

27  Carney), Carney, FTI and Bingham also falsely represented during the May 15, 2013

28  investor call and in the related presentation (and then again in the May 30, 2013

McKool Smith Hennigan, P.C.
Los Angeles, CA

114

2:15-cv-08574-PSG-MRWx

THIRD AMENDED COMPLAINT

updated presentation) that Rural/Metro's Last Twelve Months adjusted EBITDA as of March 31, 2013 was $70 million, when they each knew it was $64 million or less. In furtherance of the conspiracy, Warburg and Carney represented that Rural/Metro's liquidity was sound when in fact they knew Rural/Metro was dangerously close to running short on liquidity. Further, in June 2013, as detailed above, Defendants failed to disclose and correct to actual and potential noteholders including Plaintiffs the May 2013 false and misleading statements by Rural/Metro and Defendants of historical facts regarding Rural/Metro's EBITDA.

461.   The conspirators misrepresented and failed to disclose these facts to induce current and potential investors, including Plaintiffs, to purchase Senior Notes, to continue the operations of Rural/Metro for as long as possible to buy time to salvage or miraculously resuscitate Warburg's investment in Rural/Metro and its reputation as an expert healthcare investor, and to allow DiMino to continue, for longer than actual results and financial management justified, as Chief Executive Officer of Rural/Metro, with the compensation and prestige that came with that position.

462.   As a direct and proximate result of the conspiracy, Plaintiffs have suffered substantial monetary losses, including without limitation monetary losses resulting from the overpayment for the Senior Notes and the loss of profits and fees, for which they are entitled to recover damages from Defendants in an amount to be determined according to proof at trial. Plaintiffs are also entitled to prejudgment interest on their losses, and all other relief that law or equity provides.

463.   In conspiring to perpetrate the fraud described in this Complaint, Defendants, and each of them, acted fraudulently with the intention of depriving investors of their property, intended to cause injury to the Plaintiffs and acted despicably with a willful and conscious disregard of the rights of others. Plaintiffs are therefore entitled to punitive damages in an amount to be determined at trial, which are appropriate to punish or set an example of the Defendants, and each of them.

McKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

## SEVENTH CLAIM FOR RELIEF

### (Negligent Misrepresentation by All Plaintiffs Against All Defendants)

464.    Plaintiffs repeat and reallege each and every allegation alleged earlier in this Complaint as if fully set forth again here.

465.    Each Defendant made material false representations to Plaintiffs.

466.    Each Defendant made the material false statements directly and indirectly to Plaintiffs and with the intent to induce Plaintiffs and others to purchase the Senior Notes.

467.    Each Defendant made the material misrepresentations without any justifiable or reasonable basis for believing those representations to be true at the time that they were made.

468.    Plaintiffs were unaware of the falsity of Defendants' misrepresentations and could not discover that such misrepresentations were false with the exercise of reasonable diligence.

469.    Plaintiffs actually and justifiably relied on the material misrepresentations of Defendants and, based on those misrepresentations, purchased the Senior Notes.  Had Plaintiffs known that Defendants' representations were false, Plaintiffs would not have purchased the Senior Notes at all or at the prices they paid.

470.    As a direct and proximate result of Defendants' misrepresentations, Plaintiffs have suffered substantial pecuniary losses, including without limitation monetary losses resulting from the overpayment for Senior Notes and the loss of profits and fees, for which they are entitled to receive damages from Defendants in an amount to be determined according to proof at trial.  Plaintiffs are also entitled to prejudgment interest on their losses, and all other relief that law or equity provide.

### PRAYER

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      For damages against each Defendant, according to proof at trial;

THIRD AMENDED COMPLAINT

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

1  **B.**  For punitive damages against each Defendant in an amount based on that

2 Defendant's outrageous conduct and sufficient to punish that conduct and deter

3 Defendant and others from engaging in such conduct in the future;

4   **C.**  An award of all costs incurred by Plaintiffs in this Action;

5   **D.**  An award of prejudgment interest as authorized by law; and,

6   **E.**  Such other and further relief as the Court deems just and proper.

7

8 DATED: July 17, 2018     Respectfully submitted,

9           MCKOOL SMITH HENNIGAN, P.C.

10

11          By___/s/ Michael Swartz_____

12             Michael Swartz

           Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MCKOOL SMITH HENNIGAN, P.C.
LOS ANGELES, CA

THIRD AMENDED COMPLAINT

1  **JURY TRIAL DEMANDED**

2  Plaintiffs demand a trial by jury on all claims.

3

4  DATED: July 17, 2018                    Respectfully submitted,

5                                          MCKOOL SMITH HENNIGAN, P.C.

6

7                                          By___/s/ Michael Swartz_____

8                                                  Michael Swartz
                                           Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT